# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### April 9, 2014 Session

## STATE OF TENNESSEE v. JESSIE DOTSON

**Automatic appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 0807688     James C. Beasley, Jr., Judge**

---

**No. W2011-00815-SC-DDT-DD - Filed September 30, 2014**

---

A jury convicted the defendant, Jessie Dotson, of six counts of premeditated first degree murder for killing his brother, three other adults, and two of his brother's minor sons at their Memphis, Tennessee home. The jury also convicted the defendant of three counts of attempted first degree murder for attacking with kitchen knives and wooden boards three more of his brother's minor children who were also present in the home. At the conclusion of the penalty phase of the trial, the jury imposed death sentences for the six first degree murder convictions, finding that the multiple aggravating circumstances applicable to each conviction outweighed the mitigating circumstances beyond a reasonable doubt. At a separate sentencing hearing on the attempted first degree murder convictions, the trial court classified the defendant as a Range II multiple offender, imposed a forty-year sentence for each conviction, and ordered these sentences served consecutively to each other and to the death sentences. The defendant appealed, and the Court of Criminal Appeals affirmed his convictions and sentences. After the case was docketed in this Court, we entered an order identifying five issues for oral argument,[1] in addition to the mandatory review Tennessee Code Annotated section 39-13-206(c)(1) (2014) requires this Court to perform. We now hold that: (1) admission of the defendant's custodial statements does not constitute plain error; (2) admission of testimony regarding the defendant's invocation of his right to counsel did not deprive the defendant of a fair trial or violate his right to due process; (3) admission of testimony about a surviving victim's statements to third parties did not violate the defendant's state and federal constitutional right to confront the witnesses against him; (4) admission of testimony regarding the defendant's history of imprisonment did not violate his right to a fair trial; and (5) admission of the pathologist's testimony about autopsies another pathologist performed did not violate the defendant's federal and state constitutional right

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

to confront the witnesses against him. We also hold, in accordance with section 39-13-206(c)(1), that: (1) the sentences of death were not imposed in any arbitrary fashion; (2) the evidence supports the jury's findings that the aggravating circumstances were proven beyond a reasonable doubt; (3) the evidence supports the jury's findings that as to each first degree murder conviction the aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt; and (4) the sentences of death are neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the nature of the crimes and the defendant. Accordingly, the judgments of the trial court and the Court of Criminal Appeals upholding the defendant's convictions of first degree murder and attempted first degree murder and sentences of death and forty years are affirmed. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals and include relevant portions thereof in an appendix to this opinion.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the
Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., and JANICE M. HOLDER, J., joined. WILLIAM C. KOCH, JR., J., and SHARON G. LEE, J., filed a separate concurring opinion.

Kathleen Morris, Nashville, Tennessee, and Marty Brett McAfee, Memphis, Tennessee, for the appellant, Jessie Dotson.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Jeffrey Dean Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Damon Griffin, Reginald Henderson, and Raymond Lepone, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual Background

### A. Guilt Phase

*1. Discovery of the Crime Scene and Initial Investigation*

The proof offered at the guilt phase of the defendant's trial established that in March 2008, thirty-year-old Cecil Dotson, Sr. ("Cecil"),[2] Cecil's five children, ranging in age from nine years to two months, and Marissa Williams, Cecil's twenty-seven-year-old fiancée and the mother of four of his children, were living at a home located at 722 Lester Street in Memphis, Tennessee. They had been living in the home for five or six months. Cecil worked as a maintenance man at an apartment complex in Memphis.

The defendant—Cecil's brother—lived with their sister, Nicole Dotson ("Nicole"), in her apartment at Goodwill Village in Memphis and worked with their father, Jessie Dotson Sr. ("Jessie Sr."), as a painter. The defendant had moved in with Nicole in August 2007, upon his release from prison. The defendant's family referred to him as "Junior."

On Saturday, March 1, 2008, Jessie Sr., the defendant, and William Waddell, Cecil's and the defendant's half brother, also known as "Fat," went to Cecil's Lester Street home to watch a televised University of Memphis basketball game with him.[3] Ms. Williams and the five children were also present at the home during this time.[4] The group was unable to watch the game because Cecil's television could not receive the broadcast. Jessie Sr. left Cecil's house around 6:00 or 6:30 p.m., and as he was leaving, he saw Cecil on the porch cleaning his grill and preparing to barbecue. He did not see Cecil or the defendant again that night and never again saw Cecil alive. Mr. Waddell left Cecil's home at 10:30 or 11:00 p.m., and when he left, Cecil was still alive.

---

[2] For clarity, we use given names, or abbreviated forms of given names, when referring to victims and witnesses who share the same surname with other victims and witnesses and/or the defendant. Use of the child victims' given names does not compromise their privacy because the record reflects that the surviving children's surnames were changed after these crimes were committed.

[3] Mr. Waddell had the same mother as the defendant and Cecil.

[4] The five children included Ms. Williams's four children with Cecil—C.J., Cedrick, Cemario and Ceniyah—as well as Cecil II, Erica Smith's child with Cecil.

When Jessie Sr. arrived at Nicole's apartment the next morning, Sunday, March 2, 2008, to pick up the defendant for work, the defendant was not there, and Nicole did not know where he was. Jessie Sr. asked Nicole to tell the defendant to contact him if he wanted to keep his job. Later that evening, the defendant called Jessie Sr. and explained that he had not called because his girlfriend, Sheila Jones, had hidden his cell phone after they argued. The defendant did not explain why he had missed work. When the defendant and Mr. Waddell went to dinner that evening, the defendant asked if Mr. Waddell wanted to pick up Cecil. Mr. Waddell had called Cecil numerous times on March 2nd but had not reached him, so they did not go by the Lester Street home.

The next day, Monday, March 3, 2008, the defendant rode to work with Jessie Sr. around 8:00 a.m., but they stopped working at 11:00 a.m. due to rain. Later that same day, the defendant called Jessie Sr., telling him that Nicole wanted him to drive by Cecil's house because Ms. Smith, the mother of Cecil's two-year-old son Cecil II, feared something was wrong. Ms. Smith had been unable to reach Cecil by telephone since the very early morning hours of Sunday, March 2, 2008, and no one had answered the door at the Lester Street home when she knocked around 3:00 p.m. that day. Ms. Smith said the door was partially open, and the radio was playing, but she did not see anyone or hear the children, although she could see the television just inside the door and the photographs on the wall across from the door. On the morning of March 3rd, Ms. Smith discovered that Cecil had not shown up for work and that his relatives had not heard from him. She still could not reach him by telephone. When she called Mr. Waddell at work numerous times expressing her concerns, he told her to call the police. She took his advice and called the police in the early evening and waited outside the Lester Street home for them to arrive.

Officer Randall Davis arrived first. As he walked in the front door, he could "smell the dead bodies." The storm door was closed, but the interior door was partially open, and he could see a person's foot lying on the floor inside. Entering the front door, Officer Davis discovered four adult bodies, later identified as Cecil, Ms. Williams, Hollis Seals, and twenty-two-year-old Shindri Roberson. All appeared to have sustained multiple gunshot wounds. Officer Davis did not check for vital signs because it was obvious to him that they were deceased.

Officer Davis, along with two other officers, continued through the house, searching for survivors and perpetrators, while another officer secured the front door. Officer Davis noticed blood throughout the house, but none of it appeared to be fresh. Officer Davis saw someone in the hallway bathroom and discovered nine-year-old C.J. in the bathtub with a knife stuck in his head. Officer Davis first believed that C.J. was deceased but then noticed the child's eyes twitch. After alerting others he had found a survivor, Officer Davis continued clearing the home.

In a bedroom on the left side of the hallway ("bedroom two"), Officer Davis discovered four-year-old Cemario, who was deceased. In another bedroom ("bedroom one"), Officer Davis discovered two-year-old Cecil II and five-year-old Cedrick, both of whom appeared deceased to Officer Davis. Meanwhile, another officer located two-month-old Ceniyah, who was still alive, and carried her out of the house.[5] The officers exited just as Memphis Fire Department personnel arrived, and Officer Davis let them know a survivor had been found in the bathroom.

Firefighter Jason Vosburgh testified that he "could smell the blood in the air" when he approached the house, describing it as "[a] thick, spoiled smell like it had been there a while." Firefighter and emergency medical technician Daniel Moore testified that, although he was instructed to check the adult victims for signs of life, he did not actually touch them because it was obvious to him that they were deceased. Mr. Moore explained that "[j]ust by looking at them and just the horrific scene that was there with all the blood and everything, it was obvious that they had been down for a while." He described the blood as "definitely old."

When Mr. Vosburgh and a paramedic entered bedroom one, they discovered that, although Cecil II was deceased, Cedrick was still alive, so they carried him outside to an ambulance. During this time, Mr. Vosburgh was informed that another deceased victim was in the other bedroom. When he returned inside, Mr. Vosburgh and Mr. Moore were summoned to the bathroom, where firefighter Herbert Henley was attending to C.J.. They removed C.J. from the bathtub and transported him to an ambulance outside. Mr. Henley recalled seeing cuts on C.J.'s face and a "sawzall blade" sticking out of the top of his head. He described the bathroom as "a mess" with "blood everywhere." Mr. Moore testified that when he and Mr. Vosburgh entered the bloody bathroom, C.J. "turned his head and the next thing we saw was one of the most horrible things I've ever seen, it was a knife stuck embedded in his skull and it was just stuck there. And it absolutely is the worst thing I've ever seen in my life." In addition to the embedded knife, Mr. Moore observed puncture wounds on C.J.'s abdomen and multiple superficial cuts to his neck.

By the time firefighter and paramedic Patrick McDevitt reached the scene, the surviving victims had already been removed and were on their way to the hospital. Mr. McDevitt and his partner were tasked with confirming that the remaining victims were deceased. To do so, they touched each victim to check for a pulse or other vital signs and ran an ECG, which required them to move clothing and affix ECG strips. They returned the clothing to its original position when they finished. Mr. McDevitt noticed that the blood on each victim appeared to be dry.

---

[5] The record does not indicate in which part of the house Ceniyah was found.

Meanwhile, Memphis Police Department Deputy Director Toney Armstrong, a lieutenant with the Homicide Bureau at the time these murders occurred, learned of the homicides. He called Lieutenant Walter Davidson[6] at home, assigned him to serve as case coordinator on the investigation, and instructed him to go to the scene. He told Lieutenant Davidson that six persons had been murdered and that three severely injured children were on their way to the hospital and not expected to survive. Not knowing the identity of the perpetrator and wanting to prevent any further attacks on the family, Deputy Director Armstrong and Lieutenant Davidson decided to quarantine the surviving children at the hospital and not release their identities. Officers of the Tactical Unit were assigned to guard the children, and the quarantine prevented relatives, the media, and everyone other than medical personnel and police personnel approved by Deputy Director Armstrong from having contact with them. No family members were allowed contact with the children from March 3rd through March 8th.

Sergeant Anthony Mullins of the Homicide Bureau was at the scene when Deputy Director Armstrong and Lieutenant Davidson arrived.[7] After he had walked Deputy Director Armstrong through the house and provided an overview of the crime scene, Sergeant Mullins left and obtained a search warrant. When he returned with the warrant later that evening, officers entered the home and began collecting any evidence located in the immediate vicinity of the deceased victims' bodies. By the time this work had been completed, the medical examiner and seven others from the Shelby County Medical Examiner's Office had arrived at the scene. By 2:30 a.m. on March 4, 2008, the deceased victims' bodies had been removed and were en route to the morgue. Sergeant Mullins and the officers assisting him left a short time later, but a uniformed officer remained behind to secure the scene. Sergeant Mullins and the crime scene processing team returned between 10:30 and 11:30 a.m. on March 4th and continued their work.

Testifying at trial as an expert in general crime scene investigation and bloodstain pattern analysis, Sergeant Mullins described the Lester Street crime scene as horrific and the worst he had ever worked. The living room, into which the front door opened, was very small, with only between five and ten feet of available space around the furniture and the

---

[6] At the time of the investigation, Lieutenant Davidson was a sergeant in the Homicide Bureau of the Memphis Police Department.

[7] When Deputy Director Armstrong and Lieutenant Davidson arrived at the scene between 6:30 and 7:30 p.m., a film crew from the television show, *The First 48*, was already on site. Both of these officers testified that they would have preferred not to allow the film crew access to the scene; however, they had no authority to do so, nor did they have authority to tell the film crew when to film or how to dispose of the film footage. Deputy Director Armstrong explained that "[t]he City [had] approved for the *The First 48* to have all of the access and privileges to go out on all homicides with us."

bodies of the four adult victims. The home, he said, was dirty and cluttered. He found evidence indicating that the crime scene had been staged, which further complicated the investigation.

All of the adult victims had sustained multiple gunshot wounds, and all except Mr. Seals had been shot at least once in the leg. Two guns were used in the shooting—a nine-millimeter and a .380 caliber—although neither gun was found at the scene or thereafter. Although the guns were not found, officers located spent bullets in the living room on the sofa cushion, on top of a piece of plastic from a window unit air conditioner, on the floor under Cecil, under the sofa, inside the arm of the sofa, between two sofa seat cushions, in the wall behind the sofa, and in the east wall of the living room.

Shell casings were also found in the living room. Officers recovered two nine-millimeter and three .380 caliber shell casings on the floor. When officers moved a jacket on the love seat, they found a sealed Ziploc bag that contained eleven more nine-millimeter and five more .380 spent shell casings. Sergeant Mullins concluded that the person or persons responsible for the crimes had collected the spent shell casings after the shootings, intending to remove them from the scene.

Sergeant Mullins believed that all of the adult victims' bodies were moved or staged after the shooting. Cecil's body was located in a kneeling position in front of the sofa, with his torso on a sofa cushion near a seam where two cushions met, and a bag of marijuana in his left hand. Cecil had sustained several gunshot wounds including several to the front of his body, one to his neck, one to the bottom of his foot, and several to his lower legs. Fibers collected from Cecil's chin and mouth were consistent with a pillow having been placed over his face when he was shot, and police found a pillow in the living room through which a bullet had passed. The gun used to shoot Cecil's legs differed from the gun used to shoot his neck. Sergeant Mullins could not determine the sequence of the gunshot wounds to Cecil's legs, but he believed that several of them may have been inflicted close to or after Cecil's death.

Sergeant Mullins opined that Cecil's body had been positioned and staged after the shooting. Sergeant Mullins believed that Cecil was likely facing his attacker when the first shot was fired, explaining that Cecil had several gunshot wounds to the front of his body, which he would not have sustained had he been kneeling with his torso resting on the sofa at the time of the shooting. Sergeant Mullins also believed that the bag of marijuana had been placed in Cecil's hand, explaining that the bag was so large that Cecil would have been unable to close his fingers around it and would have dropped it had he been holding it during the shooting or while attempting to flee or defend himself.

A loaded twelve-gauge sawed-off shotgun was found on a stack of clothing in the corner of the living room, a little more than an arm's length from Cecil's body. Five more live rounds of shotgun ammunition were found under the sofa. DNA testing of blood found on the end of the shotgun barrel revealed that two-month-old Ceniyah was a minor contributor of the blood. According to Sergeant Mullins, the blood on the shotgun barrel indicated that the gun was positioned atop the clothing after the shooting, because no blood spatter was found on any of the clothing beneath the gun and the blood on the gun belonged to a victim whose body was found in another part of the home.

Ms. Roberson's body was located in a seated position on the floor, with her back to the sofa, her legs extended, and her head to the side, between the sofa and the loveseat. Her shirt was pulled up, exposing her breasts, and her pants were pulled down, exposing her lower body from her waist to her knees. A clear plastic bag containing what appeared to be between three and five rocks of crack cocaine was found on the outer portion of her vagina. Sergeant Mullins concluded that Ms. Roberson's body also had been staged after the shooting and that she had been pulled from the sofa to the floor near the time of or after her death and her clothing then altered. Little blood was found on the floor beneath her body, but a nearby sofa cushion was stained with very thick coagulated blood, which Sergeant Mullins described as consistent with the type of blood loss that would occur from a gunshot wound like that Ms. Roberson sustained to her leg. Ms. Roberson's pants were also saturated with blood, and bullet holes in her pants corresponded to the location of the gunshot wounds to her legs, indicating that her pants were covering her legs when she was shot and were pulled down afterwards. The bag of crack cocaine also appeared to be part of the staging, as it was only slightly touching her and appeared to have been placed on her body.

On the floor beneath and around Ms. Roberson's body were items that appeared to Sergeant Mullins to have been emptied from a purse, although he did not locate an empty purse in the room. These items were not collected as evidence, and Sergeant Mullins could not recall seeing any type of identification, although he did recall seeing Ms. Roberson's cell phone and photos among these items. Three hairs were collected from Ms. Roberson's right leg, thigh, and buttocks and sent to the Federal Bureau of Investigation for testing. Considering the dirty condition of the home and the considerable traffic through it during the previous months, Sergeant Mullins did not view the hairs as significant and opined that they could have easily adhered to her body when it was moved.

Sergeant Mullins believed that Ms. Williams's body, too, had been positioned after the shooting. Ms. Williams's body was located on the floor, slumped over onto Ms. Roberson, with her legs positioned across Ms. Roberson's legs. He pointed out, however, that the carpet was bloodstained on the side opposite of the way she was leaning. Additionally, Ms. Williams's legs were lying across Ms. Roberson's legs, indicating that Ms.

Williams's body had been staged *after* Ms. Roberson's body had been positioned on the floor.

Sergeant Mullins testified that Mr. Seals's body was located across from the front door and near the door connecting the kitchen and the living room. However, Mr. Seals's body was not visible upon entering the home because a large television blocked the view across the living room. Mr. Seals was wearing a black shirt and black pants. His pants were pulled down to below his knees. A cup and a wallet were found near his body, as was a purse with the contents inside, which was later identified as belonging to Ms. Williams. Inside the kitchen, just beyond Mr. Seals's body, officers discovered a spent projectile under a table and a defect in the kitchen wall, which appeared to have been made by gunfire from the living room.

Although Sergeant Mullins believed that Mr. Seals was shot in the area where he was found, he opined that Mr. Seals's clothing and body were altered after the shooting. He pointed out that a pool of blood on the carpet near Mr. Seals's body had a "void" in it—an area where the carpet was not bloodstained—indicating that something had been covering the unstained area of carpet when the blood pool formed. The carpet was bloodstained on the opposite side of Mr. Seals's body as well. Based on the bloodstains, the distance between them, and the location of Mr. Seals's legs one atop the other, Sergeant Mullins believed that Mr. Seals's body may have originally been lying in the area of the "void" and may have been rolled from that area when his pants were pulled down and his wallet removed.

Sergeant Mullins testified that all of the sharp force and blunt force injuries sustained by the deceased and surviving children were inflicted with kitchen knives and wooden boards the perpetrator found in the home. Sergeant Mullins pointed out that officers discovered a gray plastic silverware tray overturned on the floor of the kitchen but did not recover an intact set of kitchen knives. In total, officers found five knife blades throughout the home, including the blade that was lodged in C.J.'s head. The word "Farberware," a brand of kitchen knives, was printed on one of the two blades recovered from inside the bathtub. Officers also recovered one intact knife handle and what appeared to be broken pieces of another knife handle. Sergeant Mullins believed the perpetrator removed the knife handles from the blades after the assaults. Officers found bloodstained and broken pieces of wood in various places, including the hallway, the bathroom, and bedrooms. According to Sergeant Mullins, the perpetrator's use of guns, knives, and boards already present in the home demonstrated the perpetrator's familiarity with the home.

Officers found blood spatter throughout the home, and according to Sergeant Mullins, the large amount of blood spatter found in the bathroom and bedrooms one and two was consistent with a prolonged "one-on-one struggle" rather than a more rapid execution of the

children.  He noted that the bathroom floor, the bath mat, the area around the bathtub, and the outside and inside of the toilet were stained with blood.  A substantial amount of blood had pooled inside the bathtub, where C.J. was found.  A bloody partial palm print, later matched to Cemario, was found on the tile wall of the bathroom. Sergeant Mullins described the palm print as a transfer stain, which results from a bloody object or body part coming into contact with and transferring blood onto another surface or object.

Sergeant Mullins identified "cast-off" blood stain patterns on the bathroom wall over the toilet tank.  This pattern is produced, he explained, when blood that has adhered to an object or weapon used to strike a person multiple times is cast off the object or weapon during the attack and onto a nearby surface or object.  Sergeant Mullins stated that the cast-off spatter on the wall above the toilet consisted of three distinct trails, indicative of three different blows.  The top trail, which he described as almost horizontal on the wall, indicated that the victim was close to the wall when the blow was administered.  Sergeant Mullins stated that because the cast-off was "a fairly wide pattern," he believed it came "from one of the boards" rather than a knife, although he could not definitively identify the weapon that produced the pattern.

On the wall over the bathtub and near where C.J. was found, Sergeant Mullins noted still more cast-off spatter, which could have come from either a knife or a wooden board.  On the wall near the soap dish he noted cast-off spatter from a different blow, and he identified still more cast-off spatter on the  wall above the bathtub faucet controls, which was indicative of additional blows.  He observed a "smeared type" transfer stain farther down inside the bathtub, as well as a thick amount of blood in the corner of the bathtub, all of which had resulted from cast-off.   On the wall next to Cemario's bloody palm print, Sergeant Mullins identified even more cast-off spatter, but he could not determine if it was associated with the bloody palm print or if it resulted from a different blow to the same victim or to another victim.

On the top of the toilet tank, Sergeant Mullins identified impact blood spatter, which occurs when an object strikes a bloody surface.  Toward the bottom of the toilet, he observed a blood transfer stain.  Sergeant Mullins also noticed that blood had dripped down from above, hitting the toilet tank and running down inside the toilet bowl.  He testified that this particular pattern was likely produced by an actively bleeding victim positioned above the toilet tank.  He testified that the pattern had been dissipated by water or someone wiping through the dripped blood. He also testified that the blood spatter indicated that someone had raised and lowered the toilet seat.

Based on the cast-off patterns, Sergeant Mullins opined that at least one, and up to three, blows were struck in the bathtub.  Based on the dripped blood and Cemario's bloody

hand print on the wall, he concluded that more than one victim was assaulted in the bathroom. Sergeant Mullins also noted that three green beads similar to those found in Cecil II's hair were recovered in the bathroom next to a large drop of blood. While he acknowledged that the beads could have been on the floor prior to the attack, Sergeant Mullins testified that the beads also could have fallen out during an attack on Cecil II in the bathroom. Sergeant Mullins explained that "[t]here is a lot of movement in the bathroom. There's more than one blow being delivered in the bathroom. You've got several pieces of broken wood that would be indicating at least one good blow, but from the blood evidence there's more than one and there's movement within that scene."

Sergeant Mullins also testified about the blood evidence in bedroom one, where Cemario's body was discovered face down on the floor in a pool of blood. Inside this bedroom, officers found two wooden boards and broken pieces of braided hair scattered across the floor. Sergeant Mullins testified that a forceful blow to Cemario's head would have broken off the weaker braids. The broken braids scattered across the floor and the pool of blood beneath Cemario's head suggested that the perpetrator struck the fatal blow while Cemario was lying on the floor in bedroom one. Large spots of dripped blood on the carpet suggested to Sergeant Mullins that Cemario may have aspirated blood. However, Sergeant Mullins believed that some portion of the assault on Cemario occurred in the bathroom. He explained that "[t]he level of violence delivered to [Cemario] couldn't have happened in [bedroom one] without some additional blood evidence. So there has to be some movement after the fact."

In bedroom two, where Cecil II and Cedrick were found, investigators found blood stains on the bed, the window blinds, the wall by the bed, the ceiling fan, and the ceiling. Sergeant Mullins testified that the blood spatter was multi-directional, indicating that multiple blows had been delivered in bedroom two. Sergeant Mullins believed that the cast-off blood spatter on the ceiling and ceiling fan resulted from a knife being raised overhead between downward stabbing motions. On the floor beneath the bed, investigators found seventeen more green hair beads like those in Cecil II's hair.

In bedroom two investigators also located a bloodstained wooden board, an intact knife handle lacking a blade, and two knife blades lacking handles. The first knife blade, found inside a pillowcase between the pillow and the pillowcase, had been bent into an "S" shape and had blood on it. Sergeant Mullins believed the blade was bent when the knife handle was removed, and he found no evidence to suggest that the blade had been twisted and damaged during the stabbing of a victim. The second knife blade, found between the mattress and the wall, and almost on top of the box springs, was discovered only after investigators moved the bed.

In the dresser of the master bedroom, investigators located a box with eleven or twelve rounds of nine-millimeter ammunition. Items were stored in the area beneath the bed. Officers collected two cordless telephones from this area, including one from the floor between the dresser and the laundry room and another from farther back in the bedroom.

Sergeant Mullins opined that a perpetrator in the living room could have trapped the children by standing in the doorway of the living room. Although doors leading to the outside of the home were located in the laundry room and the master bedroom, to reach those doors from the hall bathroom or from bedrooms one and two, the children would have been required to walk through the living room. In addition, the door in the laundry room was secured by a tied cord and appeared as if it had not been used in awhile. Most of the windows in the home had bars.

According to Sergeant Mullins, the perpetrator spent considerable time in the house staging the crime scene after the murder. Sergeant Mullins reiterated his opinion that all four adult victims were moved either close to the time of death or after death, and he noted that Ms. Roberson was not petite and that pulling down her pants, as well as those of Mr. Seals, would have taken time. More time would have been required to position Ms. Williams's legs across Ms. Roberson's legs, to place the marijuana in Cecil's hand, and to place the crack cocaine on Ms. Roberson's body. Sergeant Mullins stated that additional time was perhaps spent moving Cemario, if he were indeed assaulted in the bathroom and later moved to bedroom one. Removing the knife handles and hiding the knife blades in the pillowcase and under the mattress would have taken more time, as would collecting and removing from the scene all but one of the knife handles. Sergeant Mullins also pointed out that the guns used in the shooting were removed from the scene, and he believed the loaded shotgun had been positioned atop the clothing after the crimes occurred. Sergeant Mullins also explained that some additional time would have been required to locate, collect, and place sixteen shell casings in the sealed Ziploc bag. According to Sergeant Mullins, " [I]t took enough time to alter things in this scene as opposed to boom, boom, stab, stab, out the door. There's a difference. If you consider all the movement in the scene after this is done, it's going to take a few minutes but not necessarily hours, I would not think." He opined that the staging of the crime scene indicated that the perpetrator felt familiar with and comfortable enough to remain in the home for the time needed to finish altering the crime scene.

Sergeant Mullins observed that having knowledge of gangs and drug activity would have been useful in staging the crime scene. However, based on his experience investigating more than 100 gang-related homicides, Sergeant Mullins opined that gang members would not have remained inside the home following the murders and would not have gone to the crime scene unarmed and used weapons they found in the home to commit the offenses. Sergeant Mullins was unaware of any gang-related homicides in which women were

murdered and children were assaulted and killed with knives and boards. Sergeant Mullins acknowledged that the defendant's DNA was not discovered on any item of physical evidence associated with the investigation; however, Sergeant Mullins testified that the lack of DNA evidence linking the defendant to the crime did not exonerate him.

### 2. The Defendant's Initial Statements to Police, the Identification of the Defendant as the Assailant, and Defendant's Confessions

While Sergeant Mullins and his team processed the crime scene, sergeants and detectives from the Safe Streets Task Force and the Organized Crime Unit canvassed the area and interviewed neighbors, while other officers questioned family members of the victims. When the police asked Ms. Williams's mother, Ida,[8] if she knew of anyone who would want to harm her daughter or Cecil, Ida named Ms. Smith, Cecil II's mother and the person who called the police, as the couple's worst enemy. She explained that the tension stemmed from Cecil's simultaneous relationships with both Ms. Williams and Ms. Smith.

Two other officers, Sergeant James Terry Max and Sergeant Joe Stark, interviewed the defendant at Lieutenant Armstrong's request. During this initial interview at the police station on March 4, 2008, the defendant was not under arrest and was considered only a possible witness. The defendant described his activities on March 1st, explaining that he and others, including Jessie Sr. and Mr. Waddell, had intended to watch a televised University of Memphis basketball game at Cecil's Lester Street home, but the plan went awry because Cecil's television did not receive the broadcast.

The defendant said he remained at Cecil's house, where Cecil's five children and Ms. Williams were also present, and "E," whom officers subsequently identified as Mr. Seals, arrived later in the evening. Around 10:00 to 10:30 p.m., the defendant, Mr. Seals, and Cecil left the Lester Street home and drove to "Frank's" apartment in the area of Highland Avenue and Spottswood Avenue. Officers later identified "Frank" as Willie Boyd Hill. According to the defendant, Mr. Seals went into Mr. Hill's apartment alone, while the defendant and Cecil waited outside in the car. A short time later, a light complexioned man wearing glasses exited the apartment, and Cecil got out of the car and talked to the man for some time. When Mr. Seals emerged from Mr. Hill's apartment twenty to thirty minutes later, the trio left and picked up Mr. Seals's girlfriend at another nearby apartment complex. From there, the defendant said the group went to the Kimball Cabana Apartments to purchase marijuana, arriving at approximately 11:30 p.m. or midnight. The defendant said that Cecil initially went into a downstairs apartment alone but soon returned to get the defendant. Together they went back inside the same apartment, and Cecil introduced the defendant to four African-

---

[8] We omit Ida's surname to protect the privacy of the surviving children, whom she has adopted.

American men, telling them that the defendant had just been released from prison. After Cecil had purchased a quarter-ounce bag of marijuana and the defendant had purchased $20 worth of marijuana, they left the apartment, ran into Ms. Smith in the parking lot, and talked with her for a while before leaving. Their next stop, according to the defendant, was at a house located off Lamar Avenue, where they talked to a woman for approximately thirty minutes. Next, the defendant said, the group proceeded to the Kansas Court housing project to pick up his son. Learning that the defendant's son was not there, they spoke to the child's maternal grandmother for approximately ten minutes, gave her money, and left. The defendant stated that he parted company with Cecil, Mr. Seals, and Mr. Seals's girlfriend at approximately 2:15 or 2:30 a.m on March 2, 2008, when they dropped him off at his girlfriend's apartment. The defendant stated that his girlfriend, Ms. Sheila Jones, was not home when he arrived, but her daughter, Keaira, and Keaira's boyfriend were there. According to the defendant, he and Keaira argued about Keaira being alone with her boyfriend. The defendant said that he went to bed after the argument and that Sheila returned home at approximately 5:05 a.m. on March 2nd.

When Sergeant Max and Sergeant Stark asked the defendant whether Cecil had any enemies, the defendant told them that Cecil and Mr. Hill had argued about two weeks earlier. The argument began, according to the defendant, when Cecil, Ms. Smith, Mr. Hill, and Mr. Hill's girlfriend returned to Mr. Hill's girlfriend's apartment after drinking at a club. According to the defendant, Mr. Hill's girlfriend called the police after seeing Cecil slap Ms. Smith. When the officers arrived, Cecil told them that there were drugs inside Mr. Hill's girlfriend's apartment. Mr. Hill also lived in the apartment, according to the defendant, and Mr. Hill and Cecil were both members of the Gangster Disciples. The defendant explained that gang members were not permitted to call the police on other gang members. According to the defendant, Mr. Hill wrote Cecil up for a violation of this rule through "Doc Holiday," and the Gangster Disciples were supposed to have held a meeting or a jury trial to determine Cecil's guilt, but Cecil failed to attend.

The defendant told the officers that Cecil always carried a .45 caliber handgun, although the defendant had not seen the gun when he was with Cecil on March 1st and 2nd. According to the defendant, Cecil also kept an AK-47 assault rifle with two magazines under a dresser at home, owned a sawed-off shotgun, and had access to a nine-millimeter handgun that belonged to Ms. Williams. The defendant told the officers that when the murders were discovered, Mr. Waddell asked Mr. Hill to call someone and find out what had happened and that Mr. Hill called "Doc Holiday" and asked him what had happened or who had committed the offenses.

Sergeant Max testified that prior to the defendant's March 4th interview the police had not been investigating the Gangster Disciples for involvement in the homicides. As a result

-14-

of the interview, however, Sergeant Max was assigned to investigate possible gang involvement. Officers began following leads about the Gangster Disciples, and gang members were interviewed, as were others who were interested in providing information.[9]

As part of this investigation, Sergeant Max spoke with Cedric Atkins, who had earlier reported hearing that Cecil had stolen $300,000 from a drug dealer. In addition, on March 7, 2008, Sergeant Max interviewed a confidential informant, who reported hearing that Cecil had stolen $50,000 in drug money from "Doc Holiday." The confidential informant was shown color copies of photographs taken from Cecil's home to verify his familiarity with the Gangster Disciples. The confidential informant identified Cecil and "Doc Holiday." Based on this identification, the officers discovered a telephone number for "Doc Holiday" and learned that he had been mentioned as the governor of the Gangster Disciples.

Members of the Gangster Disciples reportedly became angry upon learning that the gang had been implicated in the murders of women and children. On either Tuesday, March 4th or Wednesday, March 5th, after Priscilla Shaw—the mother of Cecil, the defendant, and Nicole—discovered that her front door had been kicked in by Gangster Disciples, Ms. Shaw, the defendant, Nicole, and Nicole's children moved in with their cousin, Sharhonda Lane, at her Gayle Street, Memphis home. While there, Nicole received calls on her cell phone, which appeared to have originated from the telephone inside her apartment. The defendant answered one of these calls and told Nicole that the caller sounded like a man disguising his voice. Becoming "terrified," Nicole went to the police department. A short time later a marked police car, assigned to protect the house, arrived at the scene.

When the defendant learned that the police had arrived outside, he became agitated and "frantic." He said that the officers were there to get him, that the police were trying to "pin" the offenses on him, and that he was not going back to jail for something he did not do. They should "just bury [him] with [his] brother," he declared. The defendant grabbed a gun belonging to Mr. Waddell and pointed it at his own head.[10]

Ms. Lane went outside and told the two officers that the defendant was threatening to commit suicide if they entered the house. One of the officers—Officer Laneeze Stepney—asked Ms. Lane to call the defendant on her cell phone. She did, and Officer

---

[9] Lieutenant Davidson said that officers received numerous leads from Crime Stoppers tips, including some from "crackpots" and "psychics" telling them "ridiculous things." Deputy Director Armstrong testified that some of the Crime Stoppers tips indicated that the murders were gang-related, and both officers testified that many of these tips implicated the defendant in the crimes.

[10] Ballistics testing of this nine-millimeter gun showed that it was not used in the Lester Street homicides.

Stepney spoke with the defendant for between five and seven minutes and convinced him to allow the officers to enter the house. During this time, the defendant told Officer Stepney, "[E]verybody think[s] I did it. I've been all on the news and the police saying I did it . . . ."[11] Shortly after he entered the residence, Officer Stepney was able to retrieve the gun and attempted to calm the defendant, who was acting "real nervous like he had a lot on his mind." The officers told the defendant that they were not there to arrest him but were there to place him and his family in protective custody. The defendant and his family were moved from the Gayle Street home into a safe house under police protective custody, and the investigation proceeded.

During this time, the surviving children remained hospitalized at LeBonheur Children's Hospital. Dr. Michael Muhlbauer, an expert in the field of adult and pediatric neurosurgery, testified that he performed surgery on C.J., Cedrick, and Ceniyah on March 3, 2008. Dr. Muhlbauer testified that when C.J. arrived at the hospital, he was moaning but was awake, lucid, and able to follow commands. C.J. had trauma and swelling to his forehead, part of a steak knife sticking out of his head, and a six-to-seven-inch laceration in his scalp that extended down his forehead. C.J.'s skull was severely fractured, and large pieces of his skull had been driven inward with a blunt force object. C.J. also had either a "glancing" stab wound or two separate stab wounds on the back of his arm and chest, a superficial laceration across his neck, a laceration on his right hand, and a laceration on his left thumb. Dr. Muhlbauer said that without medical intervention C.J. would not have survived the injuries he sustained.[12]

Dr. Muhlbauer testified that Cedrick exhibited significant facial trauma and was "essentially semicomatose" when he arrived at the hospital. Cedrick had sustained injuries that were, in Dr. Muhlbauer's opinion, consistent with having been beaten with boards, including multiple fractures to his face, mid-face, and the lower portion of his skull, a fractured nose which had been pushed inward, and a small skull fracture with bruising on the back of his brain. In addition, Cedrick sustained stab wounds to one eye, his forehead, and his neck. Dr. Muhlbauer testified that Cedrick would not have survived without medical intervention.

Dr. Muhlbauer testified that Ceniyah arrived at the hospital with significant head trauma, which included a large cut in her scalp that exposed her bone. The right side of

_____

[11] Ms. Lane testified that the media had been discussing the defendant's background on television for "hours" and that at the time he threatened suicide the television news was showing a story profiling him.

[12] Dr. Muhlbauer noted that he did not treat the external lacerations C.J. and Ceniyah sustained and that a general surgeon would have treated these injuries.

Ceniyah's skull had been pushed or crushed in with a blunt object, resulting in an "open-depressed skull fracture." A CT scan revealed that the covering of Ceniyah's brain was "probably cut" and that her brain was mildly bruised. Dr. Muhlbauer testified that Ceniyah's injuries were consistent with being struck with boards. She also had stab wounds to her left lower extremity. Dr. Muhlbauer said that absent medical intervention, Ceniyah would not have survived these injuries.

Deputy Director Armstrong decided to have an officer attempt to speak with C.J. early in the investigation because of the possibility that C.J. might die. The police considered C.J. very important to the investigation because he was familiar with all of his father's associates. On March 5th, two days after they had undergone surgery, then Sergeant (now Lieutenant) Caroline Mason of the Homicide Bureau was assigned to LeBonheur Children's Hospital and instructed to assess the surviving children and determine what information they could provide. She attempted to interview C.J. that same day, but she found him "in and out" of consciousness, cursing, "talking crazy," and screaming out names, including "Cassandra" and "Roderick." Officers investigated C.J.'s statements and learned that Ms. Williams had a sister named Cassandra, but after further investigation they concluded that she was "obvious[ly]" not involved in the crimes. Lieutenant Davidson said that officers continued to investigate any of C.J.'s statements that made sense. At some point, officers decided to send Pat Lewis of the Child Advocacy Center to the hospital with Lieutenant Mason to talk to C.J.

On March 7, 2008, officers received a telephone call from a nurse at the hospital informing them that C.J. was awake and rational and that the police needed to come talk to him. During the ensuing interview, C.J. reported that "Uncle Junior"—the defendant—was the person responsible for killing C.J.'s parents and their friends and for stabbing and attacking him and his siblings.

Lieutenant Mason called Deputy Director Armstrong and reported that C.J. had implicated the defendant as the perpetrator of the crimes. He instructed her not to tell anyone what she had learned until he had a chance to listen to the tape recording of C.J.'s identification. After listening to the tape, Deputy Director Armstrong ordered the defendant transported from the safe house to the Homicide Bureau, and he assigned Lieutenant Mason and Sergeant Max to interview him.

The defendant, who was under arrest at that time, was advised of his rights, signed a written waiver, and agreed to speak with the officers. Lieutenant Mason told the defendant that they wanted to clear up some things and determine whether he had any information to add to what he had provided in his March 4th interview. She asked the defendant whether he had any gang affiliation, and he replied that he was a Crip in prison. When she asked

about his relationship with Cecil, the defendant stated that, on one occasion, Cecil had called the police and falsely reported that the defendant had committed a robbery.

Lieutenant Mason then asked the defendant to tell them again about what he did on March 1st and about the last time that he had seen Cecil alive. According to Lieutenant Mason, the defendant essentially repeated the account he had given during his March 4th interview, varying in only one or two respects. Specifically, he told them that he, Cecil, and Mr. Seals had gone to Mr. Hill's apartment so that Mr. Seals could retrieve a gun. He also told them that when Cecil introduced him to the men in the apartment where they had purchased marijuana, Cecil had referred to the defendant as his "bitch ass brother who just got out of prison." According to Lieutenant Mason, the defendant "frowned" when he recalled this introduction. After purchasing the marijuana, the defendant said that Cecil drove him to an apartment complex to pick up his son, who was not home, and then dropped the defendant off at Ms. Jones's apartment. The defendant maintained that he did not return with Cecil to the Lester Street home.

At some point, the defendant stopped talking to Lieutenant Mason and Sergeant Max. Deputy Director Armstrong, who had been observing the interview, decided to enter the room and continue the interview himself. Deputy Director Armstrong testified that he watched the defendant's body language as he talked to the defendant about how horrific the crimes were. He said the defendant seemed "really, really tight, like he was doing everything he could not to talk to me." According to Deputy Director Armstrong, the defendant gave one-or-two-word answers to questions and would not engage in open conversation. Deputy Director Armstrong said that "[m]ost of the time if I asked him a question, he would nod his head or shake his head. But you could tell he was doing everything he could not to engage me in an open conversation as to where we had open dialogue back and forth with each other."

Deputy Director Armstrong said that, when he entered the interview room, he knew that the defendant was very familiar with the criminal justice system and that the defendant had only recently been released from prison. When Deputy Director Armstrong asked the defendant whether he believed in God and in heaven and hell, the defendant said that he did. Deputy Director Armstrong stated that the defendant was "struggling to try to maintain his composure" and at times during the interview leaned forward as if he wanted to make a statement but would then lean back. Deputy Director Armstrong said that he could tell the defendant was hiding something.

At one point, Deputy Director Armstrong allowed the defendant to grab his hands, attempting to convey to the defendant that he knew something was weighing heavily on the defendant's mind. Although it appeared to Deputy Director Armstrong as if the defendant

were about to speak to him, the defendant refused to engage in conversation and asked to go to the restroom. Deputy Director Armstrong allowed him to go. When the interview resumed, Deputy Director Armstrong asked the defendant what his family called him, and the defendant replied, "Junior." He asked the defendant if anyone else in his family was referred to as "Junior," and the defendant said, "[N]o." In response to questions, the defendant also told Deputy Director Armstrong that no one else in his family looked like him and no one in the family had ever confused him with someone else in the family. When the defendant was asked whether a member of his family would be referring to him if the person used the name "Junior," the defendant said yes.

Deputy Director Armstrong then played the tape recording of C.J. stating that he had been stabbed by his "Uncle Junior." According to Deputy Director Armstrong, the defendant became visibly upset and appeared as if he were about to cry. The defendant then told Deputy Director Armstrong that he and Cecil went somewhere to get a gun, began arguing, and continued to argue during the drive back to Cecil's house. The defendant said that when they returned to Cecil's home, the argument escalated. When Cecil reached for a shotgun, the defendant began shooting, using both his gun and Ms. Williams's gun. The defendant said that he then attempted to "get rid" of the children because they had seen him. The defendant stated that he "stuck them," using the knives from the kitchen drawer.

According to Deputy Director Armstrong, the defendant began to cry and appeared as if "he had gotten the weight of the world off his shoulders. But it was almost like I'm defeated." Deputy Director Armstrong testified that when he began to question the defendant in greater detail about what had occurred in the house, using his knowledge of the crime scene to frame the questions, the defendant asked for an attorney, and the interview ceased. The defendant also asked to speak with his mother, Priscilla Shaw.

During the early morning hours of March 8th, officers went to the safe house where Ms. Shaw was in protective custody with other family members, informed her that the defendant wanted to see her, and drove her to the police department. When she arrived, she went into a room and spoke to the defendant. No one else was in the room with them. She took the defendant's hands and asked him what was happening. She asked if the police were "trying to put it on him." The defendant did not respond at first, but when he looked up, he told Ms. Shaw that he "did it." When she asked him, "why the babies," the defendant said they had seen him. He explained that he and Cecil had been arguing all day and that Cecil had a gun. Ms. Shaw asked the defendant if Cecil had pointed the gun. The defendant said that Cecil did not but was "just talking and swinging it." When Cecil put the gun down, the defendant said that he began shooting. The defendant said that he later rode a bicycle away from the scene to the home of his girlfriend, Ms. Jones. Ms. Shaw testified that she "asked him [why] the kids and he said they saw me. And I said but the baby, the baby. He didn't

say nothing, just shook his head. And I got up and told him I love him and I left." The defendant told both Deputy Director Armstrong and his mother that he committed the offenses. He did not indicate that anyone else either assisted him or perpetrated the crimes.

*3. Investigation and Testimony Corroborating the Defendant's Confessions*

After C.J. identified the defendant as the lone perpetrator and the defendant admitted his guilt to Deputy Director Armstrong, the police investigation into gang involvement ended. The investigation turned to determining whether the crime scene evidence was consistent with and corroborative of the details of the defendant's admissions and his description of how the offenses were committed. Witness testimony at trial reflected the results of this investigation.

Officers located and seized C.J.'s yellow Magna bicycle, which the defendant admitted to riding away from the scene, in a shed behind Ms. Jones's Memphis residence. Although officers hoped to find blood from the victims on the bicycle, only genetic material from an unknown male was found on the bicycle. Neither the victims' blood nor the defendant's DNA was found on it.

Keaira Jones testified at trial that at 10:00 or 10:30 p.m. on March 1, 2008, the defendant and Cecil came to her home and that both appeared to be intoxicated. When she told them her mother was not home, Cecil wanted to leave, but the defendant left only after she allowed him to enter and search the apartment for her mother.

Keaira testified that the defendant returned between 3:00 and 4:30 a.m. She allowed him to enter the apartment, but she returned to her bedroom, closing the door. Approximately five minutes later, he knocked on her bedroom door and asked to talk to her. She was putting her son to sleep and told the defendant that she would speak to him shortly, but she fell asleep and never opened the door. Before falling asleep, she heard water running in the bathroom. Keaira was asleep when her mother came home, and the defendant and her mother left together the next morning. After they left, Keaira noticed bleach spots on the brown rug in the bathroom. She also noticed that a bottle of Clorox bleach was in the hallway and not stored in its usual place. Keaira denied arguing with the defendant about being home alone with her boyfriend.

Ms. Jones testified that she met the defendant through Nicole, with whom she had worked, and that she was aware that the defendant had moved in with Nicole after being released from jail. Ms. Jones testified that when she returned home at approximately 5:00 a.m on March 2nd, the defendant was lying in her bed, which surprised her because he knew she would be out with girlfriends. He told her that "ladies don't come in at five o'clock in

the morning," and they went to sleep. They got up at 10:30 or 11:00 a.m. on March 2nd, and she testified that she dropped him off at Nicole's apartment.

On Monday, March 3rd, the defendant asked Ms. Jones to pick him up at Cecil's Lester Street home, but when she arrived, the street was blocked by ambulances, fire trucks, and police cars. The defendant was "kind of upset and shaking" and told her that something had happened to his brother. Ms. Jones testified that the defendant never told her that he knew what had occurred at Cecil's home. After learning that the defendant had been arrested, Ms. Jones called him and visited him in jail. A week or two after his arrest, she asked the defendant why he would not assist the police in their investigation, and he replied that "they got to figure it out." Ms. Jones testified that she had seen the defendant with a gun on one or two occasions, and she described the gun as having a "wheel" and being "blue with a little blue on it."

Willie Boyd Hill, Jr., Cecil's best friend, testified that he had visited Cecil's home on Lester Street on several occasions. Mr. Hill said that he knew "Doc Holiday," "Cato," "Dread," and Mr. Seals because he, Cecil, Mr. Seals and the other men were all members of the Gangster Disciples. He stated that the defendant was a member of the Crips gang.

Mr. Hill testified that on the evening of March 1, 2008, Mr. Seals, Cecil, and the defendant came to his Memphis apartment between 10:30 and 11:30 p.m. Mr. Seals, who had just been released from jail, came to retrieve a pistol he had left with Mr. Hill. The gun, Mr. Hill said, fired .380 caliber bullets, which were loaded by inserting a clip, and he added that the gun ejected shell casings. The parties stipulated at trial that the gun Mr. Hill returned to Mr. Seals on March 1, 2008, was a P-232 Sig Sauer handgun, a .380 caliber pistol, which could hold up to eight rounds, consisting of a seven-round magazine and a single round in the chamber.

Mr. Hill testified that "Trell," another gang member, went outside to talk to Cecil while Mr. Seals was in Mr. Hill's apartment. Mr. Seals took the loaded gun and left with the defendant and Cecil. Mr. Hill did not see any of them again until the day the homicides were discovered.

Mr. Hill said that he learned of the homicides from Mr. Waddell, who called him on March 3rd and said that something had happened to Cecil's family. Mr. Hill went to the crime scene, and he recalled the defendant being there as well. Upon seeing Mr. Hill, the defendant asked Mr. Waddell why he had called the men who had committed the crimes. Mr.

Hill testified that he told the police he had called "Cato"[13] from the crime scene, stated, "[Y]a'll went too far," and asked him directly if he and "Doc Holiday" had something to do with the murders. "Cato" denied any involvement in the murders.

Mr. Hill acknowledged that he and Cecil had a "falling out" on the evening of Valentine's Day, less than a month before the murders. According to Mr. Hill, Cecil, Ms. Williams, Ms. Smith and he had gone out drinking at a club. Afterwards, they went to Mr. Hill's girlfriend's apartment, where Cecil and Ms. Smith began arguing. Mr. Hill testified that, when Ms. Smith ran upstairs into his girlfriend's apartment, Cecil followed her and began beating on the doors and windows and cursing both Ms. Smith and Mr. Hill's girlfriend. Mr. Hill's girlfriend called the police, and when they arrived, Cecil told them of marijuana inside the apartment. Cecil's report to the police angered Mr. Hill because Cecil knew that Mr. Hill also stayed at the apartment and that Gangster Disciples were not supposed to call the police on each other.

Mr. Hill testified that he told "Cato" what had happened and that "Cato," in turn, informed "Doc Holiday." "Doc Holiday," whom Mr. Hill described as the Gangster Disciples' "coordinator" over the Orange Mound area, asked Mr. Hill to explain to "Dread"— the chief of security over the area—what he had reported to "Cato." Later, Mr. Hill was summoned to an apartment on Dwight Street in Memphis, where he, "Doc," and "Dread" discussed the matter, and "Dread" told him to "write [Cecil] up."

Mr. Hill explained that a "write-up" is a disciplinary notice within the gang that results in punishment. Possible punishments for a write-up, he stated, include "[p]unches to the chest, punches to the lip, pumpkin head, three minutes to a DV" or "death violation." Generally, Mr. Hill explained that when a death violation is ordered, it applies only to the individual gang member and not to everyone associated with him. Mr. Hill denied writing Cecil up for a violation of gang rules. He also explained that if the Gangster Disciples had wanted to kill Cecil, they easily would have been able to get him alone and would not have waited until 2:00 a.m. Mr. Hill said that he had never heard of any gang murders involving innocent women and children, and he stated that if the Gangster Disciples had entered a home to kill someone, they would have been armed and would not have run out of bullets. Also, Mr. Hill said that "Dread" and "Doc" would not have harmed Cecil, with whom they were close friends.

---

[13] The person known by this nickname, Markel Lester, testified for the defense at trial and spelled the nickname as "K-A-D-O-E." The nickname is spelled "Cato" in the record on appeal and in the Court of Criminal Appeals's opinion, and we utilize this spelling as well.

Mr. Hill acknowledged that he had heard that "Cato" and "Doc" approached Cecil about his gang violation and that Cecil told them to "shove it" and would not accept the discipline. Mr. Hill also had heard that Cecil had hung up on "Doc" and that "Doc" had slept with Ms. Williams. Mr. Hill also agreed that he and Cecil, whom he described as "outspoken," had argued on occasions other than Valentine's Day 2008, and he said that Cecil and "Doc" had disagreed over drywall work that Cecil performed at "Doc's" apartment.

Mr. Hill testified that until mid-February 2008, the overseer or head of the Gangster Disciples in Memphis was Eric Brown, known as "Big Easy," and that Mr. Brown had been murdered. Mr. Hill was unaware until his trial testimony that Vernon Motley, whom the police suspected of murdering Mr. Brown, was a member of the Traveling Vice Lords and that Mr. Motley's girlfriend, Tammy Randolph, was Cecil's first cousin.

Nevertheless, Mr. Hill denied being an active gang member at the time of the killings.[14] He said, "None of us was participating in any gang meetings or nothing like that but we still had love for it." He testified that he had contacted the police and cooperated with them and had submitted both a hair and a DNA sample. He said that he did so because Cecil was his friend and Cecil's family was like his own family.

Stacey Young, a friend of Cecil's, testified that at approximately midnight on March 2, 2008, Cecil, the defendant, and Mr. Seals came to her home in Cecil's blue Lincoln. Cecil introduced the defendant to Ms. Young, and they talked "for a minute." Before the three men left, Cecil told Ms. Young that he would return after dropping off Mr. Seals and the defendant. When Ms. Young called Cecil about an hour later, at approximately 1:00 a.m., he told her that he had not "made it off Pendleton" and indicated he still planned to return, but he never did return.

Ms. Smith testified that she had never been a gang member, although Cecil and his friends were Gangster Disciples. She, too, described the Valentine's Day falling out between Cecil and Mr. Hill, and she confirmed that it originated when Cecil informed the police of the marijuana in Mr. Hill's girlfriend's apartment. Ms. Smith also described the dispute between Cecil and "Doc Holiday" over "Doc's" failure to pay Cecil for repair work he had done at "Doc's" apartment.

---

[14] Mr. Hill acknowledged having prior convictions for manufacturing, delivering, and selling a controlled substance; possession of cocaine with the intent to manufacture, sell, or deliver; possession of marijuana; and felon in possession of a handgun. Mr. Hill was on probation at the time of the defendant's trial.

Ms. Smith also testified that she had seen Cecil, the defendant, and Mr. Seals at approximately 12:30 a.m. on March 2, 2008, at her Kimball Avenue apartment. When she went outside to talk with them, Cecil told her that he would return, but she told him not to come back. After Cecil left, she called him three times. The first time she called, at approximately 1:15 a.m., she spoke to him. The second time she called him, at approximately 1:30 a.m., he did not answer. But when she called him a third time at 2:00 a.m., they spoke. During this last telephone call, Ms. Smith testified that she heard Cecil and the defendant arguing and using profanity. Ms. Smith recounted her attempts to locate Cecil on March 2nd and 3rd and related that she called the police on the afternoon of March 3rd and waited outside the Lester Street home for them to arrive. Ms. Smith confirmed that her son, Cecil II, was one of the children killed in the house.

Charity Wright, an employee of Crickett Wireless, testified about Cecil's cell phone records and the calls he received on March 2, 2008. Ms. Wright testified that Ms. Smith called Cecil's number at 12:59 a.m. and that the call lasted seven minutes and ten seconds. Ms. Young called Cecil's number, through a possible three-way call, at 1:06 a.m., and the call lasted two minutes and ten seconds. Ms. Smith called again at 1:11 a.m.,1:25 a.m., and 1:30 a.m., but the calls were not answered. Ms. Smith called Cecil again at 1:37 a.m., and the call was answered, but it lasted only twenty-eight seconds. Ms. Wright said the next call came at 3:11 a.m. and went to voice mail.

Nicole testified that she was aware that Cecil and Mr. Hill had referred to themselves as Gangster Disciples, but she stated that they did not "mingle" on the streets with gangs or gang members. She was also aware that the defendant was a member of the Kitchen Crips. Nicole testified that the defendant moved in with her after his release from jail and that she had been too frightened of him to ask him to leave. Nicole explained that the defendant had held a "grudge" against his family for not visiting him more often while he was in jail, and she said that the defendant expressed his feelings about this grudge to her daily.

Nicole testified that Cecil and two of his children picked up the defendant from her apartment for a barbecue at Cecil's home in the early evening of March 1st. Nicole did not see the defendant again until approximately 10:00 or 11:00 a.m. the next morning, Sunday, March 2nd, when she saw him outside her apartment in Ms. Jones's car and saw the defendant and Ms. Jones having a "physical altercation" in the front seat of Ms. Jones's car. According to Nicole, and contrary to Ms. Jones's testimony, the defendant left again with Ms. Jones without coming inside Nicole's apartment and did not return to Nicole's apartment until that evening.

Nicole said that she went to Cecil's house at approximately 6:30 p.m. on March 3rd with the defendant and her cousin Tammy Randolph. Ambulances, fire trucks, and police

cars were already at the scene when they arrived, and the police would not allow her to enter the house. Nicole said she did not learn who had died and who had survived at that time. According to Nicole, the defendant instructed her not to talk to the media, explaining that they would likely blame him for the murders because of his criminal background. She also recalled the defendant becoming very angry when Mr. Hill and "Trell" were called to the scene, and she recalled the defendant telling her, while they were still at the scene, that he believed Mr. Hill and "Trell" had committed the homicides. Nicole described Cecil and the defendant as "gun fanatics." She said the defendant never told her that he was at Cecil's home at the time of the homicides or that he rode C.J.'s bicycle away from the scene.

Jessie Sr. testified that when he learned of the killings, he believed they were gang-related because Cecil had told him that he was attempting to leave the Gangster Disciples and was worried that they might harm him. Cecil had asked Jessie Sr. to move in with him, explaining that gang members respect the family of other gang members and would be unlikely to harm Cecil if Jessie Sr. were living with him. Although Jessie Sr. moved in with Cecil, he lived there only about a month because several of his own brothers warned him that he would likely be killed if he interfered in Cecil's situation with other gang members.

Jessie Sr. testified that Cecil and the defendant had a normal relationship, although it bothered the defendant when Cecil told others that the defendant had recently been released from jail. Jessie Sr. said that Cecil's children liked the defendant and that the defendant spoiled them with junk food. Jessie Sr. recalled seeing a gun on the counter at Cecil's home the evening the group gathered to watch the basketball game, which he later learned belonged to the defendant. Jessie Sr. described the gun as "kind of like a powder blue," stated that it was "a revolver, the kind with the thing that turn[s,]" and said that it was the type of gun that does not eject shell casings. Jessie Sr. recalled seeing Cecil move the gun out of reach, commenting that the children might mistake it for a toy. Jessie Sr. said Cecil told the defendant that he had moved his gun.

Jessie Sr. agreed that the defendant never told him what had happened to Cecil prior to the discovery of the bodies. However, he said that the defendant had called him a few days before trial and told him what he knew about what had occurred inside Cecil's house. Jessie Sr. provided no further details about what the defendant told him during this phone call.

Mr. Waddell testified that, on March 1, 2008, he and Cecil visited "Doc Holiday" during the day because "Doc Holiday" wanted Cecil to perform some maintenance work for him. According to Mr. Waddell, the defendant and Cecil were not arguing during the time he spent with them on March 1st. Mr. Waddell recalled seeing the defendant with a black and silver gun that evening, instead of the blue revolver the defendant ordinarily carried.

Two of the child victims also testified. C.J., the oldest surviving victim, was in fifth grade by the time of the trial. He had undergone many surgeries, according to his maternal grandmother, and additional surgeries would be required. C.J. testified that in the Lester Street house he shared a single bedroom with his brothers. He had slept on the top bunk bed and his brothers, Cedrick and Cemario, had slept on the bottom bunk. His older sister used the other bedroom,[15] and his parents' bedroom was in the back of the house. C.J. recalled that, on the night of the attacks, he was watching television in his sister's room because the television in his room was not working. Hearing a gunshot, C.J. walked out of his sister's room and into the hallway. C.J. recalled peeking into the living room and seeing "my Uncle Junior point a gun toward my daddy," who was not saying anything. C.J. testified that he saw "some smoke and sparks come out [of] the gun" and then looked "down on the ground" and "saw [a] dude on the floor[]," who was wearing a black shirt and black pants.

C.J. testified that when he heard another gunshot, he "peeked" through the door, walked into the hallway, and saw the defendant shooting at a woman who was on the arm of the couch. C.J. did not recognize the woman, but he recalled that she was telling the defendant that she loved him, but the defendant "just kept on shooting."

C.J. said that he then returned to his sister's room and sat down on the bed. Hearing footsteps coming toward the door, he turned and saw the defendant holding a "handheld knife," which C.J. described as the type that opens and closes. C.J. said that when the defendant cut him on his neck, he told the defendant that he loved him, but the defendant replied, "[N]o, you don't." C.J. then lay down on the bed, and Cecil II began crying. C.J. heard the defendant then say to Cecil II, "[D]on't worry about it, you ain't going to get hurt."

C.J. testified that he tried to retrieve the telephone from the hallway to call the police, but before he could do so, he saw the defendant's feet in the doorway and heard the defendant ask him what he was doing. When C.J. told the defendant that he was going to call the police, the defendant said he would kill C.J.'s parents and Cecil's friends if C.J. did so. C.J. recalled asking the defendant if he could use the bathroom and noticing that the defendant had a "kitchen knife" in his hand. C.J. recalled the defendant allowing him to go to the bathroom, but stated that the defendant "ma[d]e [him] put [his] head in the tub." When he had done so, the defendant tried to stab C.J. in the chest, but C.J. put his hand up to block the blow, and the knife went into his head instead.

C.J. recalled seeing his mother, Ms. Williams, in the doorway of the bathroom saying that she did not want to die. The defendant asked her for Cecil's cell phone and car keys, and

---

[15] C.J.'s older sister, Cierra, was not at home at the time these crimes were committed.

Ms. Williams replied that the keys likely were in Cecil's car. C.J. recalled the defendant then saying to Ms. Williams, "sorry because I ain't let your husband or your husband's friends get away with it and the kids." Then C.J. heard what he described as a "huge fall on the ground."

C.J. testified that he next saw the defendant walking in the hallway with a garbage bag and another kitchen knife, going into C.J.'s sister's bedroom. C.J. heard someone yelling and heard the defendant saying "shut up." C.J. then heard Cemario ask to use the bathroom and saw blood dripping from Cemario's head onto the rim of the toilet seat. He said that Cemario asked the defendant if he could return to his room and the defendant said that he could. Next, C.J. said, the defendant went into the kitchen, grabbed another knife, and entered the bedroom of C.J. and his brothers. C.J. said he saw Cemario lying on the bed and the defendant stab Cemario, who then fell on the floor. C.J. said he heard "rambling" in the hallway near the laundry room, as if the defendant were attempting to move something out of the way. C.J. then fell asleep in the bathtub and heard nothing more that night.

C.J. testified that when he awoke, he saw firemen in his bedroom looking at Cemario. One of the firemen came into the bathroom and got C.J. out of the bathtub. C.J. was transported to the hospital by ambulance. C.J. said that no one was with the defendant during the attacks and that the defendant acted alone. By the time of trial, more than two years had passed since C.J. identified the defendant as the lone perpetrator of the crimes. During that time, C.J. had not wavered in his identification of the perpetrator.

However, C.J. also testified at trial that he had told "Ms. Pat" in a previous interview that on the same night that the "bad thing" happened, a woman named "Cassandra" knocked on the door and said that she needed to use the bathroom. She and some other people, including a man wearing a mask with "[a] little bit of blood" on it, entered the house. C.J. had never seen the man before, but he recalled Cecil referring to the man as "Roderick." C.J. did not recall who allowed "Roderick" to enter the house, although he acknowledged that he had previously told "Ms. Pat" that Cecil allowed "Roderick" to enter the house and that he was mad at Cecil for doing so. C.J. testified that "Roderick" said something to Cecil about the gang and also told Cecil, "[Y]ou got too big, boy." According to C.J., "Roderick" fired a gun at Cecil and said, "[N]ever stop playing with the gang boy, . . . you never know what would happen, boy."

On redirect examination, C.J. again identified the defendant as the person who stabbed him in the head, shot his parents and their friends, and hurt his brothers and baby sister.

On recross-examination, C.J. testified that he saw a fight in the living room between Cecil and the man in the mask and again maintained that the man was shooting at Cecil. He also agreed that he had met with "Ms. Caroline" and "Ms. Pat" at "Ms. Pat's" office, and had

said, when they asked him how he knew some of the things he told them, that his "granny" had told him.

Cedrick, who had been five years old at the time of the assaults and murders, testified as well and also identified the defendant as his assailant. By the time of trial, Cedrick was eight years old and in the third grade. Cedrick recalled living on Lester Street with his family. Cedrick said that the defendant had stabbed him on the nose, forehead, and wrist and that no one else was with the defendant.

Cedrick testified that the attacks occurred at night but before he had eaten dinner. He did not recall hearing gunshots that night and also did not recall seeing the defendant shoot anyone. He said that no one had told him that the defendant shot anyone. Cedrick testified that the defendant got the knife he used to stab them from his car, but he could not remember the color of the defendant's car. Cedrick said that, although he had not seen the defendant stabbing his parents, he recalled that his parents and their friends were stabbed. Cedrick said that when his parents were killed, all of the children, other than one of his brothers and the baby, were locked in his sister's bedroom. Cedrick stated that his brother had told him that Ms. Williams was injured while she was in the living room changing the baby's diaper.

Cedrick testified that he heard Ms. Smith on the telephone calling the police, and he recalled that Nicole, whom he referred to as "Auntie Foxy," was also present when they were attacked. Cedrick acknowledged previously telling "Ms. Pat" and C.J. that his father never should have opened the door. Cedrick explained that a fight began after his father opened the door, and he remembered many people fighting that night, and specifically recalled a man, whom he did not know, fighting with his father and his father's friends. Cedrick also remembered C.J. sneaking out of the house after the defendant had stabbed him and riding on his bicycle to his grandmother's home. Cedrick testified that he had sneaked up on his "Uncle Jessie," got on his own bike, and also rode away to his grandmother's home. Cedrick recalled that when he and C.J. left, everyone was still alive in the house and were talking, singing, and having fun.

On redirect examination, Cedrick said that he had been in his sister's room when the defendant stabbed him, and he also recalled telling "Ms. Pat" that the defendant stabbed him. On recross-examination, Cedrick testified that he had talked to "Ms. Pat" after he had been living with his family for a period of time and after he had listened to others discussing the homicides and attacks.

*4. The State's Expert Testimony*

The prosecution's proof also included the testimony of a medical examiner and forensic experts in hair and DNA analysis, as well as that of an expert in firearms identification. Dr. Lisa Funte, a Shelby County medical examiner and expert in forensic pathology, testified regarding the victims' autopsies, three of which she had performed herself and three of which were performed by Dr. Miguel Laboy, another medical examiner in the Shelby County Medical Examiner's Office, who did not testify.

Dr. Funte testified that Mr. Seals, whose autopsy had been performed by Dr. Laboy, died as a result of multiple gunshot wounds, including: one to his mouth, which fractured some of his teeth and his jaw and then continued into his neck, fracturing the first and second cervical vertebrae; one to his midline upper chest area, in which the bullet injured his left lung and exited from his back; and one to the side of his chest near his right armpit, in which the bullet traveled through his right chest cavity, injured his right lung, and penetrated into the muscles of his back.

The toxicology report showed that Mr. Seals had marijuana and ethanol in his system. However, Dr. Funte explained that ethanol is produced as the human body decomposes, so she was unable to determine whether the ethanol resulted from alcohol consumption or decomposition, or both.

Dr. Funte testified that Ms. Williams, whose autopsy she had performed, sustained five gunshot wounds: one to the left side of her head that resulted in injuries to the skull and brain; one to the right side of her chest, which entered near her breast and exited on the left side of her back, causing injuries to her lungs and vertebral column; one to her left leg, which injured her muscles, tibia, and fibula; one to her right thigh, which injured the soft tissue and muscle; and one to the left side of her abdomen, which injured soft tissue and muscle. Ms. Williams died of the multiple gunshot wounds she sustained. Ms. Williams's toxicology report indicated the presence of ethanol, but Dr. Fuente again could not determine if the ethanol stemmed from alcohol consumption or decomposition, or both.

Dr. Funte testified that Ms. Roberson, whose autopsy she performed, also died of multiple gunshot wounds. Ms. Roberson had four gunshot wounds: one to her right thigh, which injured the soft tissue and muscle of her thigh, traveled through the femoral vein, and continued through the soft tissue and muscle on her right side toward her back; one to her left knee, which injured soft tissue and muscle; one to her left calf, which injured soft tissue and muscle; and one to her left thigh, which again injured soft tissue and muscle. Dr. Funte testified that, judging from the wound pattern on Ms. Roberson's legs and the wound pattern on her jeans, she had been wearing the jeans when she was shot and her clothes had been

rearranged later. Dr. Funte testified that the gunshot injury to the femoral vein in Ms. Roberson's right thigh would have resulted in a great deal of blood loss but would not have caused immediate death. Dr. Funte testified that Ms. Roberson could have died as quickly as five or ten minutes after receiving the wound or survived up to twenty or thirty minutes, depending on the circumstances. According to the toxicology report, no drugs or alcohol were present in Ms. Roberson's system.

Dr. Funte testified that Cecil, whose autopsy was performed by Dr. Laboy, also died of multiple gunshot wounds. Cecil sustained eight gunshot wounds: one to his head, which fractured his jaw; one to his neck, in which the bullet traveled through the soft tissues and muscles of his neck before fracturing and penetrating his trachea and larynx; one to his chest, in which the bullet traveled through muscle and soft tissue and into his back; one to his right thigh, in which the bullet perforated through the thigh, injuring soft tissue and muscle; two to his left thigh, in which the bullets injured soft tissue and muscle; one to his left leg, in which the bullet injured soft tissue; and one to his left foot. The toxicology report indicated Cecil also had ethanol in his system, although the source, again, could not be determined. Dr. Funte testified that fiber found in the area around the entry of the gunshot wound to Cecil's head was consistent with the shooter placing a fiber-filled pillow over Cecil's face and firing the gun through the pillow.

Dr. Funte also testified that a black hair and a white hair were collected from Ms. Williams's hand and that hairs were collected from Ms. Roberson's back, buttocks, and right thigh. She further stated that a green substance that appeared to be marijuana was collected from Cecil's hand, the color of Cecil's skin beneath the green substance was tan or brown, and his hand below the substance was stained with blood.

Dr. Funte also performed the autopsy on one of the child victims, two-year-old Cecil II. She testified that Cecil II died of multiple sharp force injuries, including multiple incised and stab wounds to his head, torso, and extremities. He sustained seven stab wounds that penetrated and fractured his skull and injured the right middle meningeal artery, causing epidural hemorrhage and edema of the brain with herniation. Among other injuries, Cecil II had a puncture-style stab wound to the right side of his head, two puncture-style stab wounds to his left cheek, two incised wounds on the left side of his face near his eye, an incised wound on his right ear, beginning at the top of his ear and continuing along the inside of the ear, a group of incised wounds of varying lengths and an incised wound leading to a stab wound on his torso, multiple incised and stab wounds on his back, and a mixture of sharp force and blunt force injuries on the left side of his torso. Dr. Funte said that incised wounds on Cecil II's back and left wrist were parallel and equally spaced, which indicated that the wounds were inflicted with a serrated knife blade. Cecil II also had an incised wound and a puncture stab wound on the base of his right thumb.

Dr. Funte also identified abrasions and contusions on Cecil II's body, which she described as blunt force injuries. Cecil II had abrasions on the right side of his head, cheek, upper and lower lips, and mouth. Dr. Funte testified that an abrasion on his head almost formed the outline of a rectangle and was consistent with the perpetrator striking Cecil II on the side of the head with a board. Cecil II also had a combination of an abrasion and a bruise on the right side of his neck behind his ear and bruises on the left side of his neck and on his elbow.

Dr. Funte also noted discoloration on Cecil II's right eyelid and cheek, which could have been caused by impact force to his eye or could have been related to the skull fractures and impact to the right side of his head. She stated that the nature of Cecil II's injuries suggested that he attempted to fend off his attacker. She also stated that the wound to his skull would have been fatal without medical intervention. Had Cecil II sustained only that wound, he could have survived from as little as several minutes to as long as one day. Had he received medical treatment within an hour of receiving his injuries, he could possibly have survived, although it was not "necessarily probable."

Dr. Funte testified that four-year-old Cemario, whose autopsy Dr. Laboy performed, also died of blunt force and sharp force injuries. She said Cemario had blunt force trauma to his head, with lacerations and bruises, multiple linear depressed fractures of the calvarium and the base of his skull, deep scalp and subarachnoid hemorrhage, and multiple contusions to his brain. Dr. Funte also noted areas of abrasions and lacerations on Cemario's head, as well as an incised wound above his left ear that tore part of his scalp away from his skull.

In addition, Cemario had incised wounds to his head, neck, and right hand. A stab wound to his chest went all the way through his body, injuring his left lung and hemidiaphragm, as well as his stomach, spleen, and liver. Cemario also sustained linear abrasions and bruises on his left arm, abrasions on his forehead, an abrasion and bruising on his right ear, a gaping incised wound to his neck, abrasions on his right arm, and an incised wound on his ring finger, which was consistent with Cemario having attempted to defend himself by holding up his hand or grabbing the knife.

Dr. Funte testified that the blunt force trauma to Cemario's head alone would have resulted in his death without medical intervention. Had Cemario sustained only this injury, he could have survived from as little as several minutes to as much as many hours, although the blow likely would have rendered him unconscious. The stab wound which passed all the way through Cemario's body also would have resulted in death, Dr. Funte explained.

Dr. Funte testified that Cecil II had incised wounds and that Cemario had lacerations. She said the majority of the incised wounds were superficial and not very deep. She also said

the wounds could have resulted from a slashing cut from a knife. Dr. Funte was not able to determine whether a serrated or smooth-edged knife was used in each injury. She identified two injuries that had a unique pattern of equally spaced incised wounds, which was indicative of a serrated blade. Dr. Funte said that while a serrated blade may not always leave such a pattern, it will do so if dragged across the skin.

Linda Otterstatter, a physical scientist forensic examiner in the Trace Evidence Unit of the FBI laboratory in Quantico, Virginia, testified regarding the analysis of hair samples removed from the crime scene. She had compared debris recovered from the crime scene with hair samples from Cecil, Ms. Roberson, Ms. Williams, Cemario, Cecil II, the defendant, and Mr. Hill. No head hair samples were submitted for Mr. Seals, C.J., Cedrick, or Ceniyah. Head hairs recovered from Ms. Roberson's back were consistent with the samples from Ms. Roberson and Cecil II. Three other hairs recovered from Ms. Roberson's back were identified as head hairs, and two of them had Caucasian characteristics, while the third had Mongoloid characteristics. These three head hairs were dissimilar microscopically to the known head hair samples and were submitted for mitochondrial DNA analysis.

Ms. Otterstatter testified that a hair recovered from Ms. Williams's right hand was a head hair similar to that of Ms. Williams, and as a result, was not submitted for further analysis. Although a body hair fragment discovered on the left side of Cemario's left hand was not suitable for microscopic comparison, it was submitted for mitochondrial DNA analysis. Hairs recovered from the northwest area of the bedroom were determined to be head hairs similar to those of Cemario and thus were not submitted for further analysis.

Deborah Polanskey, a forensic examiner in the mitochondrial DNA unit of the FBI laboratory, testified that mitochondrial DNA is inherited from the mother alone and is not individually unique, as siblings with the same mother share the same mitochondrial DNA profile. Hair has thousands of copies of mitochondrial DNA, Ms. Polanskey stated; therefore, mitochondrial DNA analysis of hair is highly effective.

With regard to the Lester Street homicides, Ms. Polanskey conducted mitochondrial DNA testing on four hairs: the three head hairs recovered from Ms. Roberson's body—two with Caucasian characteristics and one with Mongoloid characteristics—and the fragment of a body hair recovered from Cemario's left hand. She received known hair samples from Cecil, Ms. Roberson, Mr. Seals, the defendant, and Mr. Hill, as well as Ms. Smith, the mother of Cecil II, and Ms. Williams, the mother of C.J., Cedrick, Cemario, and Ceniyah.

The two hairs with Caucasian characteristics had the same mitochondrial DNA sequence, but this sequence differed from all the known samples Ms. Polanskey received. The hair with Mongoloid characteristics lacked sufficient mitochondrial DNA to obtain a

sequence. The mitochondrial DNA sequence of the hair found on Cemario's hand was concordant with Ms. Williams's mitochondrial DNA sequence, meaning that the hair could have come from Ms. Williams, C.J., Cedrick, Cemario, or Ceniyah. Ms. Polanskey determined conclusively that the defendant could not have been the source of the hair.

Special Agent Lawrence James, a forensic scientist for the Tennessee Bureau of Investigation ("TBI"), testified as an expert in forensic serology and DNA analysis. He analyzed numerous blood samples taken from the house and determined that each of them matched to one of the victims and none matched the defendant. A partial DNA profile he obtained from a bullet fragment recovered from the sofa in the living room was consistent with a male, and Cecil could not be excluded as a contributor. He swabbed all of the green beads recovered at the scene, but the sample produced only a partial profile, consistent with male DNA that did not match that of any of the victims or the defendant.

Special Agent James testified on cross-examination that his analysis of the defendant's pants, which were seized following his arrest, revealed only blood matching the defendant. He found no blood of any of the victims on the defendant's clothing. He also did not find the defendant's DNA on the knife blades, the knife handles, the victims' bodies, the wood boards, the glass, the pillows, the shotgun, the shell casings, or the shoes. He testified that analysis of the scrapings from Ms. Roberson's nails yielded a DNA profile of an unknown female.

TBI Special Agent Forensic Scientist Cervinia Braswell, an expert in firearms and firearms identification, testified regarding evidence found at the crime scene and the nature of the firearms used in the crime. She identified the bullets recovered from the victims and the scene. With respect to Cecil, she explained that a nine-millimeter bullet was recovered from his left thigh, a .380 caliber bullet was recovered from Cecil's right scapula, and a .380 caliber auto bullet jacket fragment was recovered from his oral cavity, which had originally been part of the .380 caliber bullet recovered from his neck. A nine-millimeter bullet jacket fragment was also recovered from Cecil's clothing. A nine-millimeter bullet jacket and fragments were recovered from Ms. Roberson's left thigh. Another nine-millimeter bullet jacket and fragments were recovered from Ms. Williams's left calf muscle. A nine-millimeter bullet jacket and fragments were also recovered from Mr. Seals's C-1 vertebrae, in addition to the .380 caliber bullet recovered from the left side of his back.

According to Special Agent Braswell, a .380 caliber firearm typically holds eight cartridges, with seven cartridges in the magazine and one cartridge in the gun. A nine-millimeter firearm typically holds thirteen rounds, with twelve rounds in the magazine and one round in the gun. Special Agent Braswell testified that she analyzed the eight .380 caliber cartridge casings and the thirteen nine-millimeter cartridge casings recovered from

the Lester Street crime scene. From her analysis, she concluded that all of the .380 caliber bullets were fired from the same gun and that the nine-millimeter casings also were all fired from the same nine-millimeter firearm. Special Agent Braswell testified that a single person could have fired all eight bullets from the .380 caliber firearm and all thirteen bullets from the nine-millimeter firearm in a short period of time. However, on cross-examination, Special Agent Braswell acknowledged that she had no means of determining whether one shooter or multiple shooters had perpetrated the Lester Street homicides.

Special Agent Braswell acknowledged that a nine-millimeter firearm is capable of firing .380 caliber rounds, but she opined that the .380 caliber casings recovered from the crime scene were not fired from a nine-millimeter firearm. She explained that a .380 caliber cartridge casing is shorter and has a slightly smaller diameter, causing the casing to bulge when it is fired from a nine-millimeter firearm. Special Agent Braswell found no bulging on the .380 caliber casings recovered at the Lester Street crime scene. She also acknowledged that some nine-millimeter firearms hold only ten cartridges in a magazine and one cartridge in the chamber. She reiterated, however, that the standard nine-millimeter weapon holds twelve rounds in the magazine and one round in the chamber.

Special Agent Braswell found no gunshot residue on the clothing of Cecil, Ms. Roberson, or Ms. Williams. The lack of gunshot residue, she explained, meant either that the shooter was far enough away from the victims when the gun was fired that it left no residue, or that an object, such as a pillow, had been placed between the gun and the victim. Although Special Agent Braswell discovered gunpowder particles on the bullet holes in Mr. Seals's shirt, without testing the gun used, she could only estimate the distance between the shooter and Mr. Seals, stating that the gun was at least two feet and no more than four feet away from Mr. Seals when fired. She was unable to determine which of the bullets recovered from Mr. Seals's body produced the residue.

### 5. *The Defense Proof*

After the prosecution rested its case, the defense presented the following proof. Cedric Atkins, whom Sergeant Max had interviewed when the police suspected gang involvement, testified that approximately a week and a half before the murders, he met Cecil and briefly talked with him in a hotel room. According to Mr. Atkins, Cecil said that he owed about $300,000 to the "mob" and advised Mr. Atkins to avoid owing people money. Mr. Atkins understood the "mob" as a reference to a group of people who have money and respect and sell narcotics or "whatever." Mr. Atkins said that after Cecil's murder, he relayed his conversation with Cecil to an officer of the Memphis Police Department to whom he had previously provided information. Mr. Atkins said that he answered the officer's questions truthfully, never demanded money from the officer or anyone else, and was not

promised anything in exchange for the information. On cross-examination, Mr. Atkins stated that he did not recall asking the police officer what was "in it for [him]." About a week later, the officer contacted Mr. Atkins and informed him that the information was not useful. Mr. Atkins acknowledged that he had been convicted of theft during the year prior to the defendant's trial, that he had not wanted to testify at trial, and had appeared at trial pursuant to a subpoena.

Sergeant Joseph Stark testified that he interviewed Mr. Waddell on March 4, 2008, at approximately 8:00 p.m. According to Sergeant Stark, Mr. Waddell stated that "Frank"—Mr. Hill—had told him that the victims were tortured and that Cecil's fingers were severed. Sergeant Stark recalled Mr. Waddell telling him about a "falling out" between Cecil and "Doc" and about Cecil and "Frank" being members of the Gangster Disciples.

Thirty-four-year-old Markel Vester, known as "Cato," testified that he had joined the Gangster Disciples in 1997 or 1998 when he was twenty-five or twenty-six years old. Mr. Vester knew "Doc Holiday" and "Frank" but did not know whether "Doc Holiday" held any rank in the Gangster Disciples in March of 2008. He confirmed that Cecil had been a member of the Gangster Disciples and that Cecil performed maintenance duties at the apartment complex where Mr. Vester lived. Mr. Vester testified that "Frank"—Mr. Hill—had called him and told him about what had happened to Cecil and the other victims. Mr. Vester recalled seeing Cecil approximately two or three weeks before his murder, but Mr. Vester could not recall whether he had spoken to Cecil by phone on March 1st or March 2nd, although he also said that Cecil had not called him on the Saturday or Sunday prior to his death. Mr. Vester confirmed that he had cell phone service through Cricket Wireless in March 2008, and he provided his cell phone number.

Ms. Wright, the Cricket Wireless employee who had previously testified for the prosecution, returned to the stand to clarify her prior testimony about Cecil's phone records. Cecil's phone records showed that Ms. Smith called him at 1:30 a.m. on March 2, 2008, and that the call lasted fifty-nine seconds but was not answered. The records also showed Cecil receiving another call from Ms. Smith at 1:37 a.m. on March 2, 2008, and that this second call lasted approximately fifty-six seconds but either was not answered or went to voicemail. Ms. Wright stated that she had been mistaken if she had previously testified that those calls were answered.

Ms. Wright further testified that Cecil had called Mr. Vester's ("Cato's) cell phone number at 12:38 a.m. on March 2nd, with the call lasting seventeen seconds. Ms. Wright said that this call could have been answered, but she had no means of determining whether a conversation actually occurred. Records showed that Cecil called Mr. Vester's number

again at 12:39 a.m. and that this second call lasted forty-four seconds. Ms. Wright stated that she could not determine whether the call was answered.

William Carroll, an employee of AT&T, testified that an eight-second call had been made at 11:35 p.m. on March 1, 2008, from the land line telephone inside the Lester Street residence to Mr. Waddell's number. Mr. Carroll was unable to determine whether the call was answered.

Dr. Nancy Aldridge, a psychotherapist and expert in the forensic evaluation of children, explained the protocol for conducting a forensic interview of a child and expressed her concerns about the manner in which C.J. and Cedrick's interviews were conducted. Her concerns included the fact that C.J. was interviewed shortly after being discovered, was interviewed on four or five occasions, and gave different statements as to what had occurred. She also expressed concern that the formal forensic interviews of the children did not occur until August 13, 2008, more than five months after the incident, explaining that, given the time that had passed, the children possibly had been exposed to information other family members had about the crimes.

Dr. Aldridge testified that C.J.'s initial account of the incident, in which he named "Cassandra," was "possibly" reliable, because persons observing the interview described C.J. as appearing to relive the trauma as he gave the statement. Additionally, Dr. Aldridge noted that the initial interviewers had appropriately used open-ended questions. She further explained that, generally, initial interviews of children produce more accurate information about a traumatic event because a child's memory becomes less clear with the passage of time and repetitive interviews, and may become contaminated by information learned from others. Dr. Aldridge also explained that if a child is questioned after having already provided an answer, the child may conclude that the initial answer was unacceptable and provide a different answer.

Dr. Aldridge also emphasized the particular importance of recording, from the beginning, all statements of a child who has been severely traumatized. Recording, she explained, preserves a record of the sequence of the child's memory and how each memory resurfaced. Dr. Aldridge testified that, although some of the records she reviewed in this case referenced interviews of C.J., no transcripts or recordings of those interviews were available, so she was not able to determine who had spoken to C.J., what questions had been asked, or what information C.J. had given prior to the interviews that were actually recorded.

Dr. Aldridge also expressed concerns about C.J.'s and Cedrick's trial testimony, stating, "The concern that I had for these children is they seemed to be very, very clear as to what questions were going to be asked each one of them and what their answers were. So

they were very prepared for the testimony." Dr. Aldridge said that, although the reliability of C.J.'s testimony was an issue for the jury, she questioned its reliability because C.J. seemed to agree with whatever question was asked of him. She also noted that, given the two-and-one-half-year period that had elapsed between the crimes and the trial, there was potential for contamination of the children's memories.

On cross-examination, Dr. Aldridge acknowledged that she did not know whether C.J.'s identification of the defendant as the perpetrator was wrong, but she reiterated that she had "concerns."

The defendant testified as the final witness at trial. He provided a detailed account of his activities on March 1, 2008, which was largely consistent with his initial statement to the police. At trial, however, the defendant placed the blame for the murders on unknown assailants and said he had been hiding under the bed in the master bedroom while the crimes were committed. In particular, the defendant recounted going to Cecil's home to watch a basketball game on Saturday, March 1, 2008, along with Ms. Williams, the children, Jessie Sr., Mr. Waddell, and Mr. Seals, who arrived a little later than everyone else. The defendant said that Jessie Sr. had left early in the evening, but the defendant had remained at Cecil's home all evening, grilling, drinking, and smoking with Cecil and Mr. Seals.

The defendant testified that sometime after dark, he, Mr. Seals, and Cecil left in Cecil's vehicle, first visiting "Frank"—Mr. Hill—at the Barclay Apartments so that Mr. Seals could retrieve his gun. The defendant testified that Cecil, Mr. Seals, and "Frank" were members of the Gangster Disciples and that he had joined the Kitchen Crips in the 1990s. When they arrived at Mr. Hill's apartment complex, the defendant stayed in the car, but Mr. Seals and Cecil exited the vehicle. As they walked toward Mr. Hill's apartment, a man walked down the steps and talked to Mr. Seals and Cecil about the incident that had occurred on February 14th, when Cecil told the police about the marijuana in Mr. Hill's girlfriend's apartment. Mr. Seals eventually proceeded to Mr. Hill's apartment alone, but Cecil remained in the parking lot, arguing with the man who had walked down the steps to talk. The defendant said Cecil often argued with others. The defendant said that the man was attempting to calm Cecil, because Cecil and Mr. Hill were "into it," and Cecil believed that the man should be on his side. Mr. Seals was aware of Cecil's argument with Mr. Hill, the defendant said, and that was why Mr. Seals had gone alone into the apartment to retrieve the gun.

The defendant testified that, when the man attempted to hug Cecil, Cecil asked why, pulled up his shirt, and told the man that he did not have anything on him. Cecil told the man that he wanted to fight Mr. Hill and instructed the man to go get Mr. Hill. When the man instead got into his black Impala, Cecil yelled, "y'all know where I stay at," before returning

to his own car. The defendant said that he and Cecil laughed and that he told Cecil that Mr. Hill had tried to call him. When Mr. Hill called again, Cecil answered; however, the caller was actually Mr. Seals, who was asking where they were. Cecil told Mr. Seals they were waiting on him. Cecil also told the defendant that he had "punk'd" the man who had tried to hug him. The defendant told Cecil to go inside and get Mr. Seals, but Cecil refused, so the defendant went to Mr. Hill's apartment. Inside, the defendant saw Mr. Hill, "Trell," "Tammy," and a man whom the defendant did not know. The defendant told Mr. Seals that he and Cecil were ready to leave, and Mr. Seals and the defendant left Mr. Hill's apartment.

The defendant said that he, Cecil, and Mr. Seals then went to Sheila Jones's home. The defendant and Cecil went inside, looking for Sheila, but she was not home. The defendant stated that he caught Keaira's boyfriend in one of the bedrooms with his pants halfway down. When Keaira began cursing him, they left, going next to the home of "Marilyn," the maternal grandmother of the defendant's son, where they stayed for less than five minutes, because the defendant's son was not there.

The defendant testified that they next went to an apartment complex near GE Patterson Church to pick up Ms. Roberson, Mr. Seals's girlfriend. Ms. Roberson asked whether they had any marijuana, and Cecil said that he knew where to purchase some, so they went to an apartment at Kimball Cabanas, where they purchased $45 worth of marijuana. Cecil got out of the car and then returned, telling the defendant that he wanted to introduce him to "his folks." According to the defendant, this term referred to members of the Gangster Disciples. The defendant testified that four people were inside the apartment, and the defendant and Cecil remained for approximately five minutes. As they were leaving, they ran into Ms. Smith in the parking lot, and Cecil talked to her while the defendant proceeded to the car. The defendant later yelled her name, and Ms. Smith came over to the vehicle and spoke to everyone inside. Afterwards, she and Cecil talked in person for five minutes more, before Cecil returned to his car and called Ms. Smith on his cell phone, and drove away.

After leaving the apartment complex, they drove to another woman's home and stayed for thirty or forty minutes, before returning to Cecil's house. According to the defendant, he, Cecil, Mr. Seals, Ms. Williams, and Ms. Roberson were together in the living room, with Ms. Williams drinking a wine cooler, and Ms. Roberson preparing a marijuana cigarette. Cecil asked Ms. Williams to put clean sheets on the bed in the master bedroom, explaining that he planned to allow Mr. Seals and Ms. Roberson to use the master bedroom, because Mr. Seals had just been released from jail.

The defendant said that he volunteered to change the sheets and that he was in the master bedroom, with a quilt in his hand, when he heard two or three gunshots. The defendant acknowledged that he was carrying a blue .44 caliber handgun at the time, but

-38-

when he heard screaming, he hid beneath the bed. The defendant claimed to have heard only a few shots at first, followed by more shots just seconds later. The defendant said he did not know whether the shots were fired from the same gun or from different guns.

The defendant said that he remained hidden beneath the bed for several minutes, because he heard other noises, which he later realized were the family dog, but which he initially believed were someone walking around in the bedroom where he was hiding. The defendant said that he was unable to hear what was going on in other areas of the home, so he eventually left his hiding place and went into the living room. The defendant said that he discovered the victims' bodies and believed all in the house, including the children, were dead. He said that the front door was open and that he left the house on a bicycle he found behind a door in the living room.

The defendant recalled riding the bicycle to Ms. Jones's home, where Keaira allowed him to enter. The defendant said that he went immediately into Ms. Jones's bathroom and vomited. Using bleach, the defendant cleaned the vomit from the sink, but he dropped some of the bleach on the floor. After brushing his teeth, the defendant knocked on Keaira's bedroom door, telling her that he needed to talk, but they never talked.

The defendant admitted that he did not report what he had seen to the police, explaining, "Y'all done heard testimony about the gangs. I'm in a gang. We don't call the police. It's just that simple. We don't call the police. It's not part of what we do. If I call the police, I'll be just like my brother." He also admitted that he had not been truthful when he told Lieutenant Mason and Sergeant Stark on March 7th that Cecil had driven him back home after they listened to the basketball game. The defendant reiterated that he did not tell the police the truth about what had occurred when initially questioned because he "[doesn't] talk to police."

The defendant stated that Mr. Waddell had spoken to a woman who said that the defendant was being reported by the media as the killer. The defendant also stated that he and his family saw the news report. The defendant acknowledged that, after seeing his face on a news report, he put a gun to his head and threatened suicide, saying that he was not going back to prison for something he did not do and declaring that he should have died with his brother. The defendant emphasized that the police officers who entered the house after his suicide threat did not offer to take him to a hospital or a mental health facility.

The defendant testified that before Deputy Director Armstrong interviewed him, he had been in the Homicide Bureau for hours and was handcuffed to a table. The defendant said that Deputy Director Armstrong played a tape recording of C.J. identifying him as the perpetrator but did not play earlier taped interviews of C.J. identifying other individuals. The

defendant stated that after playing the recording, Deputy Director Armstrong began screaming about the defendant's family and said that he was tired of "playing games." According to the defendant, Deputy Director Armstrong said that he knew the defendant was "bullshitting" and that he was "sick of it." The defendant said that Deputy Director Armstrong began "pounding" on the table and demanding to have answers "now."

The defendant acknowledged telling Deputy Director Armstrong that Cecil had reached for a shotgun and that he had then just started shooting. The defendant also recalled then asking to see his mother. The defendant agreed that he told his mother that Cecil had a gun and that when Cecil put down his gun, the defendant began shooting. He also admitted telling his mother that he "stuck" the children.

The defendant denied these statements at trial, explaining that, when he was interviewed on March 7th, he had not slept since the homicides were discovered on March 3rd and that he had cried and had been depressed about what had happened. The defendant stated that he asked to see his mother approximately three times during the interview, but Deputy Director Armstrong told him that he would not be allowed to see anyone until the defendant told him what he wanted to know. The defendant said that, earlier on March 7th, he had told other officers that he did not kill the victims. The defendant insisted that his statement to Deputy Director Armstrong admitting his guilt was not true, and he proclaimed his innocence of the crimes, stating that he did not kill Cecil or any of the other victims.

The defendant confirmed that, at the time of the homicides, his cousin, Tammy Randolph, was dating Vernon Motley. At some point prior to the homicides, Ms. Randolph told the defendant that the police were looking for Mr. Motley in connection with a murder charge and gave him a .44 caliber firearm to keep for her. At Ms. Randolph's request, the defendant later gave this gun to another person—Ms. Randolph's cousin "Antonio."

On cross-examination, the defendant admitted that when he left Cecil's house on the bicycle, he believed all nine people inside the Lester Street home were dead. He acknowledged that he did not call 9-1-1 and that instead he went to Sheila's home and went to bed. He admitted that he did not go to work the next day or report the crimes to anyone, although he went to dinner with Mr. Waddell on Sunday, March 2nd. The defendant acknowledged that he also went to work Monday morning with his father but failed to tell either of his parents about what had occurred while he was hidden beneath the master bed at Cecil's home. The defendant admitted also that he had lied to his family about the last time he had seen Cecil.

The defendant further stated on cross-examination that he did not attempt to escape when he heard the first shots fired. Although the master bedroom had a door exiting to the

outside of the home, the defendant said that he did not have the key that was needed to open the door.  The defendant also admitted that he did not attempt to use the cordless phone in the master bedroom to call for emergency assistance.  The defendant said that he remained under the bed for approximately thirty minutes.  He denied ever hearing the children scream and claimed that he never heard anyone hitting the children with boards.  The defendant said that he remained under the bed while the killers altered the crime scene by gathering the shell casings and pulling down Ms. Roberson's pants.  The defendant said that when he entered the living room, Ms. Roberson was positioned in the manner emergency personnel discovered her and as she appeared in the crime scene photographs.  The defendant claimed that he saw C.J. lying in the bathtub but said that he did not "pay attention" to the knife in C.J.'s head.  The defendant did not check on C.J. to determine whether he was alive and believed that everyone in the house was dead.

The defendant testified that he was in the interview room with Deputy Director Armstrong for four or five hours, and the defendant maintained that he had confessed only after Deputy Director Armstrong screamed at him and threatened him.  The defendant explained:

> He didn't pound on the table.  It was he asked me when he played the tape and after he played the tape, he played the tape what, [twelve, thirteen] times.  And after he played it [twelve] to [thirteen] times, after I still told him I didn't do it, that's when he said I'll kill your mother f***ing ass myself, you cold-hearted murdering killing mother f***er.

According to the defendant, Deputy Director Armstrong then said: "I got something for you.  I'm going to throw your ass on that 4th floor and I'm going to let them kill your mother f***ing ass."

The defendant acknowledged that his testimony at trial regarding the events was not consistent with what he had told his mother.  The defendant said that he had leaned across the table and told his mother, "[T]hey trying to put this on [me]."  His mother asked for the names of those who were trying to do this so that she could get him help.  The defendant said that he told her he did not know their names and that they were watching him.  The defendant said that he and his mother then grabbed each other's hands, that he told his mother not to worry, and then admitted to committing the offenses.  The defendant acknowledged that he told his mother that he and Cecil began arguing and that, after Cecil put down his gun, he had begun shooting.  The defendant also recalled both his mother asking him how he got away from the house and his response that he rode away on a bicycle.  The defendant agreed that he had told his mother that he killed the children because they saw him.  However, the defendant insisted that he had lied to his mother and that his trial testimony was truthful.

The defense rested after the defendant's testimony, and the prosecution called no rebuttal witnesses.

At the conclusion of the guilt phase, the jury convicted the defendant of six counts of premeditated first degree murder for killing Cecil, Ms. Williams, Mr. Seals, Ms. Roberson, Cemario, and Cecil II. The jury also convicted the defendant of three counts of attempted premeditated first degree murder for the attacks upon C.J., Cedrick, and Ceniyah. The trial then proceeded to the penalty phase on the six first degree murder convictions.

## B. Penalty Phase

The prosecution relied upon the proof submitted at the guilt phase of the trial. In addition, the parties stipulated that the defendant had been previously convicted of second degree murder, which qualified as a felony involving the use of violence to the person. The prosecution introduced three additional photographs of Cemario and Cecil II's bodies as proof of the (i)(5) aggravating circumstance.

The State also presented victim impact evidence through the testimony of Ms. Williams's mother, Ida, and Mr. Seals's aunt, Annette Mallory. Ida testified that she had adopted her surviving grandchildren and was raising them. As a result, she had lost her job and was struggling financially. She and her family were in counseling as a result of the homicides. Ms. Mallory testified that at the time of his death, Mr. Seals had three children, whom he loved and supported. She said Mr. Seals's death had "hit [her] hard" because he had been like a younger brother before his mother died and that she had been a mother figure to him after his mother's death.

The defense offered the testimony of Glori Shettles, a mitigation specialist, who described the defendant's family history and background. She said that some of the defendant's family members were willing to provide information about him but others were not willing to testify on his behalf. From her investigation, Ms. Shettles had learned that the defendant's parents were married in 1972, when his mother, Ms. Shaw, was fifteen years old and his father, Jessie Sr., was nineteen years old. They soon had a daughter, Nicole. Jessie Sr. joined the Army and was stationed in Florida, where the defendant was born. At some point, Ms. Shaw and Nicole left Florida and returned to Memphis, where Nicole became so ill that Jessie Sr. left his base and returned to Memphis also.[16] After three years, Jessie Sr. was honorably discharged from the Army. He wanted the family to remain in Florida, but he was unable to obtain employment, so the family returned to Memphis. Cecil, who was three years younger than the defendant, was born in Memphis.

_____

[16] Jessie Sr. apparently left his base without permission, for which he was disciplined at the time.

Ms. Shettles testified that Jessie Sr. had been jealous of Ms. Shaw, who went on a church trip to New Orleans, returned with a boyfriend, and told Jessie Sr. that she no longer wanted to be married to him. They remained married for some time after that incident, however. Ms. Shettles learned through her investigation that the defendant's parents argued often. Jessie Sr. was physically abusive to Ms. Shaw on more than one occasion, and the children witnessed the abuse. Ms. Shaw decided to leave Jessie Sr. and saved money to do so. When Jessie Sr. returned home one day, Ms. Shaw and the children were gone. Ms. Shaw did not contact Jessie Sr. until four to five months later. The defendant was six years old at this time, and the children did not know what had happened to their father.

Ms. Shettles testified that the family moved often during the defendant's childhood. Ms. Shettles noted that one of the risk factors for poor performance in school and in life is moving often during childhood. The defendant was diagnosed with a learning disability in reading and math and was enrolled in resource classes. He also had disciplinary problems at school and at home. School mental health records indicated that he was provided with individual counseling. Counselors attempted to meet with Ms. Shaw, but she either cancelled the appointments or did not attend them.

Ms. Shettles testified that the defendant failed fourth grade twice due to excessive absences from school. The defendant missed school, according to Ms. Shettles, because others teased him for not having proper clothing. After repeating fourth grade, the defendant was socially promoted in school. Ms. Shettles believed that the defendant was capable of performing better in school but that his performance was hindered by the excessive absences and tardies. When the defendant left school at age sixteen, he was still in the eighth grade and had attended ten different schools.

Ms. Shettles testified that by age fifteen, the defendant had become involved in the juvenile court system and had several arrests and juvenile adjudications. Ms. Shaw was unable to control him and did not know what to do. She attended juvenile court with the defendant on many occasions, and Nicole attended on Ms. Shaw's behalf when she could not attend.

Ms. Shettles testified that the family did not have much money and that Ms. Shaw was often not home. Although Nicole did her best to care for her brothers, food was locked up, and the children were not able to get to it. When the children visited their maternal grandmother for Sunday dinner, the defendant and Cecil stole money from their grandmother's purse to purchase food. They were severely punished for doing so, and their grandmother eventually told Ms. Shaw that the defendant and Cecil were no longer welcome in her home.

The defendant worked only very little after leaving school. The only legitimate job that the defendant had ever held was as a security guard at the age of eighteen. At age nineteen, the defendant pleaded guilty to second degree murder and was sentenced to eighteen years in prison. When he first entered prison, the defendant received many write-ups for refusing to participate, cursing at an officer, and other offenses that did not involve weapons. He also received write-ups for violent activities. Ms. Shaw and her husband visited the defendant only once while he was incarcerated. No other family members visited him, and the defendant spoke to his father by telephone on only a few occasions. Ms. Shettles said that the defendant participated and "thrived" in a behavioral modification program while in prison. The defendant was twice considered for parole before being released on parole after serving fourteen years of his eighteen-year sentence.

Ms. Shettles testified that some of the defendant's family members value his life but attending his trial and showing support for him had been difficult for them. Ms. Shettles explained that another friend of the defendant had been afraid to appear at trial. Ms. Shettles said that the defendant has an ongoing relationship with his son and that an eighty-one-year-old friend of the defendant's grandmother also cares for the defendant.

On cross-examination, Ms. Shettles testified that the defendant had been suspended from school so many times that the Memphis City Schools refused to allow him to continue to attend. Ms. Shettles further acknowledged that the defendant had more than one juvenile adjudication involving his use of weapons. Ms. Shettles agreed that the school and juvenile records indicated that the defendant fought often and had problems with his brother Cecil. Ms. Shettles was aware that the defendant had joined the Crips gang while in prison and that he had received a write-up for violence while incarcerated because he and four other inmates cut an inmate who was trying to leave the Crips.

At the conclusion of the penalty phase, the trial judge instructed the jury regarding the aggravating circumstances the State was alleging as to each first degree murder conviction and also instructed the jury as to mitigating circumstances. The jury unanimously found multiple statutory aggravating circumstances applicable to each first degree murder conviction. With regard to Cecil's murder, the jury found the following three aggravating circumstances: (1) the defendant was previously convicted of one or more felonies involving the use of violence; (2) the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during the act of murder"; and (3) the defendant committed mass murder. See Tenn. Code Ann. § 39-13-204(i)(2), (3), (12)

(2014).[17]  Regarding the murders of Ms. Williams, Mr. Seals, and Ms. Roberson, the jury unanimously found five aggravating circumstances, including the same three found to be applicable to Cecil's murder, as well as the following two additional aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another; and (2) the murder was knowingly committed while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder.  See Id. § 39-13-204(i)(6), (7).  Regarding the murders of Cemario and Cecil II, the jury unanimously found seven aggravating circumstances, including the same five that it had found applicable to the first degree murders of Ms. Williams, Mr. Seals, and Ms. Roberson, as well as the following two additional statutory aggravating circumstances:  (1) the victim was less than twelve years old and the defendant was eighteen years old or older; and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death.  See Id. § 39-13-204(i)(1), (5).  The jury determined that the aggravating circumstances applicable to each first degree murder conviction outweighed any mitigating circumstances beyond a reasonable doubt and imposed a sentence of death for each of the defendant's six first degree murder convictions.  The trial court entered a judgment in accordance with the jury's verdict.

At a separate sentencing hearing on the defendant's three attempted first degree murder convictions, the trial court classified the defendant as a Range II multiple offender, imposed a forty-year sentence for each conviction, and ordered these sentences served consecutively to each other and to the death sentences.  The defendant appealed, and the Court of Criminal Appeals affirmed the defendant's convictions and sentences.  The defendant's appeal was then automatically docketed in this Court.  See Tenn. Code Ann. § 39-13-206(a)(1).

## II.  Analysis

### A. Admission of the Defendant's Confessions

The defendant contends that the admission of his custodial statements violated his rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and article I, sections 7 and 9 of the Tennessee Constitution.  In particular, the defendant claims that: (a) his warrantless arrest was not supported by probable cause; (b) his confession to police officers was the fruit of his illegal arrest; (c) his confession to police officers was

---

[17] The text of the relevant statutes has not changed since the time of trial; thus, citations are to the current statute.

coerced after he had invoked his right to remain silent; and (d) his confession to his mother should have been suppressed because she was acting as an agent of the police. The defendant concedes both that he did not file a pretrial motion to suppress and that he did not raise any of these issues in his motion for new trial.

The State argues that the defendant forfeited his right to appellate review of these issues by failing to raise them in a pretrial motion to suppress, as required by Tennessee Rule of Criminal Procedure 12(b)(2)(C), which states that "a motion to suppress evidence" is among those motions that "must be raised before trial." The State says that not even plain error review applies when a defendant fails to file a pretrial suppression motion. As support for this argument the State relies on federal decisions construing the identical language of Federal Rule of Criminal Procedure 12(b)(3)(C) as precluding even plain error review on appeal when a defendant fails to make a pretrial motion to suppress. See, e.g., United States v. Burke, 633 F.3d 984, 987-88 (10th Cir. 2011); United States v. Yousef, 327 F.3d 56, 125 (2d Cir. 2003); United States v. Chavez-Valencia, 116 F.3d 127, 129-134 (5th Cir. 1997). Among other things, the State argues that unless a defendant files a pretrial motion to suppress, the State may not have an opportunity to establish that the challenged evidence was seized lawfully because the evidence relevant to the suppression issue may not be admissible and relevant to an issue at trial.

### 1. Failure to File Pretrial Motions to Suppress in Capital Cases

This Court has previously faced the issue of whether appellate review in a capital case extends to suppression issues raised for the first time on appeal. In State v. Duncan, 698 S.W.2d 63 (Tenn. 1985), Mr. Duncan "never moved to suppress" his "statements, fingerprints, blood and saliva tests obtained as the result of [his] detention." Id. at 68. When he challenged the admission of this evidence for the first time on appeal, the State argued that review was foreclosed because the issue had been waived. Id. at 67-68. This Court disagreed, stating that where a "defendant is under sentence of death, this [C]ourt is under the duty to 'automatically' review the sentence." Id. (quoting Tenn. Code Ann. § 39-2-205(a) (currently codified at Tenn. Code Ann. § 39-13-206(a)(1) (2010)). As a result, the Duncan Court explained that "there is no waiver of error directed to the admissibility of evidence when the defendant is under sentence of death." Duncan, 698 S.W.2d at 68; see also State v. Nesbit, 978 S.W.2d 872, 880-81 (Tenn. 1998) (holding that, given the statutory mandate directing this Court to review capital convictions and sentences, a defendant's failure to file a motion for new trial does not deprive this Court of jurisdiction to review issues that should have been raised in a motion for new trial). The Duncan Court cautioned, however, that "review of an alleged error is handicapped at times by the failure of trial counsel to object to the introduction of evidence, as his failure too often deprives the opposing party of the opportunity to remove any question as to the competency and relevancy

of questioned evidence." Duncan, 698 S.W.2d at 68. Because Mr. Duncan had failed to make a pretrial motion or trial objection either challenging the admissibility of the evidence as fruit of an illegal arrest or arguing that Mr. Duncan's statements were obtained in violation of his constitutional rights, the Duncan Court determined that proof had not been "directed by either party so as to delineate fully the circumstances surrounding [Mr. Duncan's] detention, arrest, and interrogation." Id. Consequently, the Court concluded that "nothing in the record" supported Mr. Duncan's contentions. Id.

Nine years later, this Court applied Duncan in another capital case in which a defendant challenged for the first time on appeal the admission of his statements on the basis that the statements were obtained in violation of his constitutional rights. State v. Bigbee, 885 S.W.2d 797 (Tenn. 1994), superseded by statute on other grounds as stated in State v. Odom,137 S.W.3d 572, 580-81 (Tenn. 2004). Mr. Bigbee had failed to make a motion to suppress, failed to object to the admission of the statements at trial, and failed to raise the issue in his motion for new trial. However, relying on Duncan, Mr. Bigbee argued that "the appellate review mandated by [statute] require[d] this Court to consider any alleged error, whether called to the trial court's attention or not." Bigbee, 855 S.W.2d at 805. This Court addressed Mr. Bigbee's argument as follows:

> [W]e have reviewed the record in this case in light of the defendant's complaint and conclude that here, as in [Duncan], there is nothing in the record to support the contentions of [Mr. Bigbee]. In the absence of an objection or motion challenging the evidence on the grounds now asserted, the proof was not focused by either party so as to delineate fully the critical issue . . . .

Id.

The statute obligating this Court to review automatically a defendant's conviction of first degree murder and sentence of death has not changed since our decisions in Duncan and Bigbee. See Tenn. Code Ann. § 39-13-206 (2010). Not only is this Court still obligated to conduct such a review, the statute now also obligates the Court of Criminal Appeals to review capital cases. Id. Thus, with respect to capital cases, the State has presented no basis for reconsidering our prior decisions, which held that a defendant in a capital case does not entirely forfeit appellate review by failing to make a pretrial motion to suppress.[18] When

---

[18] Our holding in this regard is limited to capital cases. We note that in non-capital cases, to which the statutory duty of automatic review does not apply, the Court of Criminal Appeals has held that trial courts should not entertain motions to suppress that are not filed prior to trial. See, e.g., State v. Randolph, 692 S.W.2d 37, 40 (Tenn. Crim. App. 1985); State v. Wilson, 611 S.W.2d 843, 846-47 (Tenn. Crim. App. 1980); (continued...)

suppression issues are raised for the first time on appeal in capital cases, we will continue to apply plain error review, as the Court of Criminal Appeals did in this case.[19] As <u>Duncan</u> and <u>Bigbee</u> illustrate, however, a defendant who fails to file a pretrial motion to suppress and make a record in the trial court will have difficulty prevailing on appeal when plain error review is applied.

### 2. Plain Error Review

When conducting plain error review, this Court will grant relief only when the following five prerequisites are satisfied:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

<u>State v. Gomez</u>, 239 S.W.3d 733, 737 (Tenn. 2007) (internal citations and quotation marks omitted). The defendant bears the burden of persuading an appellate court that plain error exists. <u>State v. Bledsoe</u>, 226 S.W.3d 349, 355 (Tenn. 2007). We evaluate each of the defendant's claims of error using these principles.

### 3. Legality of the Arrest

The defendant first argues that his warrantless arrest was illegal because it was not supported by probable cause. The defendant says all of his custodial statements were fruit of his illegal arrest, and as such, should have been excluded from evidence at trial. The State counters that the defendant's warrantless arrest was legal as it was based on probable cause.

---

[18](...continued)
<u>Feagins v. State</u>, 596 S.W.2d 108, 109-110 (Tenn. Crim. App. 1979). We express no opinion on this separate issue.

[19] Indeed, the State asked the Court of Criminal Appeals to review the suppression issues for plain error. The State changed its position in this Court and argued for the first time that the defendant forfeited all appellate review of suppression issues by failing to make a pretrial suppression motion.

The defendant's warrantless arrest implicates the protections of the Fourth Amendment to the United States Constitution[20] and article I, section 7 of the Tennessee Constitution.[21] These constitutional provisions prohibit unreasonable searches and seizures, State v. Day, 263 S.W.3d 891, 900-01 (Tenn. 2008), and require generally that searches and seizures be conducted pursuant to a warrant that is issued after a judicial determination of probable cause. State v. Bishop, 431S.W.3d 22, 36 (Tenn. 2014).

A warrantless search or seizure is presumed unreasonable and evidence seized thereby is subject to suppression, unless the State establishes one of the recognized exceptions to the warrant requirement. Id. An arrest supported by probable cause is one of the exceptions to the warrant requirement. State v. Echols, 382 S.W.3d 266, 277-78 (Tenn. 2012). This exception is codified at Tennessee Code Annotated section 40-7-103(a)(3) (2012), which states that a warrantless arrest is permissible when "a felony has in fact been committed, and the officer has reasonable cause[22] for believing the person arrested has committed the felony." Id.

As the United States Supreme Court has recognized, "[a]rticulating precisely what . . . 'probable cause' mean[s] is not possible." Ornelas v. United States, 517 U.S. 690, 695 (1996). Probable cause is "more than a mere suspicion," State v. Lawrence, 154 S.W.3d 71, 76 (Tenn. 2005), but it is not absolute certainty, State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982). Moreover, "the strength of the evidence necessary to establish probable cause to arrest is significantly less than the strength of evidence necessary to find a defendant guilty beyond a reasonable doubt." Bishop, 431 S.W.3d at 41.

---

[20] The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[21] Article I, section 7 states:

That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures; and that general warrants, whereby an officer may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offences are not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted.

[22] We have previously held that "reasonable cause" and "probable cause" are synonymous. Echols, 382 S.W.3d at 278. We use "probable cause" in this opinion.

As the very name implies, "the probable-cause standard is . . . a practical, nontechnical" concept, State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989) (citations and internal quotation marks omitted), which focuses upon "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act," Draper v. United States, 358 U.S. 307, 313 (1959) (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)); see also Echols, 382 S.W.3d at 278; Melson, 638 S.W.2d at 351. Thus, probable cause exists when "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." Echols, 382 S.W.3d at 277-78 (citations, alterations, and internal quotation marks omitted).

When determining whether probable cause existed to support a warrantless arrest, a reviewing court considers the entire record, including the proof adduced at any suppression hearing and the evidence presented at trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998). Additionally, a reviewing court considers

> the collective knowledge that law enforcement possessed at the time of the arrest, provided that a sufficient nexus of communication existed between the arresting officer and any other officer or officers who possessed relevant information. Such a nexus exists when the officers are relaying information or when one officer directs another officer to act.

Bishop, 431 S.W.3d at 36.

> [I]f the source of the information is a person (1) who is known to the police, (2) who is not part of the "criminal milieu," and (3) whose motivation is to aid the police without any expectation of remuneration, then the information is deemed reliable and is sufficient to provide probable cause for arrest. On the other hand, when the information is provided (1) by a professional informant who gives tips for money or favors, (2) by a person from the "criminal milieu" who may have an ax to grind, or (3) by an anonymous informant, the information is presumptively suspect, and the State must establish its credibility.

Id. at 37.

The record on appeal in this case establishes that at the time of the defendant's arrest, the police knew that: (1) C.J., a citizen informant, and an eyewitness to and victim of the crime, as well as a nephew of the defendant, had identified the defendant as the perpetrator

-50-

of the homicides and assaults; (2) the crime scene had been altered; (3) the murders and assaults were accomplished with weapons found inside the home; (4) the defendant, a close relative of three of the six murder victims and three of the assault victims, had spent time in the home on Lester Street and was familiar with it; (5) the defendant was one of the last persons to see Cecil and Mr. Seals alive; and (6) the defendant had been previously convicted of murder and only recently released from incarceration. Based on the foregoing facts, we conclude that "at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, [were] sufficient to warrant a prudent person in believing" that the defendant had committed the Lester Street homicides and assaults. Echols, 382 S.W.3d at 277-78 (citations omitted) (alterations and internal quotation marks omitted).

In arguing that the police lacked probable cause, the defendant asserts that C.J.'s identification of the defendant is not entitled to the presumption of reliability ordinarily accorded information from citizen informants because the prosecution failed to show that C.J. was "motivated solely by a sense of civic duty." This argument is without merit. "Information provided by a citizen/bystander witness known to the [police] is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information." State v. Cauley, 863 S.W.2d 411, 417 (Tenn. 1993) (citing Melson, 638 S.W.2d at 354-55); see also State v. Day, 263 S.W.3d 891, 904 (Tenn. 2008) ("We acknowledge that information from a known citizen informant is presumed reliable and not subject to the same level of scrutiny applied to a compensated informant.").[23] The rationale for applying the presumption of reliability in these circumstances is two-fold. First, "[c]itizen informants, whether they be victims or witnesses, have necessarily gained their information through first-hand experience." State v. Luke, 995 S.W.2d 630, 636-37 (Tenn. Crim. App. 1998) (citing Melson, 638 S.W.2d at 354-56). Second, "[t]he criminal informant provides information in exchange for some consideration—whether it be monetary or the granting of some exemption or privilege—*while the citizen informant acts in the interest of society or personal safety*." Id. (citing State v. Smith, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993) (emphasis added); see also Day, 263 S.W.3d at 904 (citing Luke with approval). Thus, although Tennessee decisions have recognized the interests that typically motivate citizen informants and justify the presumption of reliability, no Tennessee decision has conditioned application of the presumption of reliability upon a showing that the citizen informant was in fact motivated

---

[23] "When the source of the information is an unnamed citizen informant, 'the reliability of the source and the information must be judged from all the circumstances and from the entirety of the affidavit.'" Cauley, 863 S.W.2d at 417 (quoting Melson 638 S.W.2d at 356);

by one or both of these interests. The presumption of reliability applies if the prosecution establishes simply that the information was provided by a known citizen informant.[24]

Equally without merit for the same reason is the defendant's argument that the presumption of reliability does not apply to the information C.J. provided because "investigators did not consider whether this young boy's implication of his uncle could have been instead motivated by some fact or circumstance entirely unrelated to the crime." A rule requiring the police to delay arresting a person the crime victim has identified as the perpetrator until the police confirm that the crime victim had no ulterior motivation for making the identification would be untenable. Such a rule would require the police to expend resources delving into a crime victim's motives rather than investigating the crime and apprehending the perpetrator. Moreover, even if we were inclined to adopt such a rule, it would have no bearing on this appeal. C.J. testified at trial, and the defendant had an opportunity to question him on cross-examination about his motivations for identifying the defendant as the perpetrator. The record contains no evidence that C.J. had any ulterior motive for identifying his uncle, the defendant, as the perpetrator of these crimes.

The defendant's warrantless arrest was supported by probable cause. Thus, the defendant has failed to establish either a breach of a clear and unequivocal rule of law or any error adversely affecting a substantial right. Thus, the defendant is not entitled to relief under the plain error doctrine.

### 4. Right to Remain Silent

The defendant next argues that his confession to Deputy Director Armstrong should not have been admitted into evidence because Deputy Director Armstrong obtained the confession by continuing to question him after he had invoked his constitutional right to remain silent. The defendant does not deny that he received Miranda[25] warnings, nor does he deny that he executed a written waiver of his constitutional rights after receiving these warnings. Instead, the defendant asserts that he subsequently invoked his right to remain silent when he told Lieutenant Mason and Sergeant Stark that he did not want to talk to them any longer. The record on appeal does not support the defendant's claim that he invoked his constitutional right to remain silent.

---

[24] Although no such showing is required, we note that the record on appeal establishes that C.J.'s identification of the defendant was motivated only by his interest in personal safety and in identifying the person who assaulted him and assaulted and murdered his siblings and parents.

[25] Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

It is certainly true that the privilege against self-incrimination guaranteed by both the Fifth Amendment to the United States Constitution[26] and article I, section 9 of the Tennessee Constitution,[27] affords criminal defendants the right to remain silent. State v. Climer, 400 S.W.3d 537, 556-57 (Tenn. 2013); State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000); State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992). However, an accused who wishes to rely on the constitutional right to remain silent must unambiguously invoke it. Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010) (holding that the defendant's prolonged silence in the face of police questioning did not amount to an unambiguous invocation of the right to remain silent); accord Climer, 400 S.W.3d at 562 (holding that "'the standard for a valid invocation of the right to counsel is the same under both article I, section 9 and the Fifth Amendment.'" (quoting State v. Saylor, 117 S.W.3d 239, 246 (Tenn. 2003)).

The record on appeal does not establish that the defendant invoked his constitutional right to remain silent. Instead, the defendant said that he did not wish to speak with Lieutenant Mason and Sergeant Stark any longer and asked to speak with other officers. The defendant's request to speak to officers other than those conducting the interview did not amount to an invocation, ambiguous or unambiguous, of his right to remain silent. Because the defendant has again failed to establish any violation of a clear and unequivocal rule of law, the defendant is not entitled to relief on this claim under the plain error doctrine.

## 5. State Agent

The defendant's next argument is that his confession to his mother, Ms. Shaw, should not have been admitted into evidence at trial. The defendant points out correctly that he had invoked his right to counsel prior to speaking with his mother. The defendant contends that Ms. Shaw was acting as a state agent when she talked with him; thus, his confession to her was obtained in violation of his previously invoked right to counsel, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by article I, section 9 of

_____

[26] This portion of the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

[27] Article I, section 9 states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9.

the Tennessee Constitution.[28] Again, the record on appeal does not support the defendant's claim.

During the trial, Deputy Director Armstrong testified that after invoking his right to counsel, *the defendant asked to speak with his mother.* As a result, Deputy Director Armstrong arranged to have Ms. Shaw transported from protective custody to the police department. Just before Ms. Shaw testified at trial, the defendant moved to suppress the confession he gave her, arguing that she had been acting as an agent of the State when she solicited his confession. Although the defendant's motion to suppress had not been timely filed before trial as Tennessee Rule of Criminal Procedure 12(b)(2)(C) requires, the trial court nonetheless held a hearing on the motion outside the jury's presence.

At this hearing, Ms. Shaw testified that, while she, the defendant, and other family members were at a safe house in protective custody, officers came and took the defendant away. She recalled that officers returned either later that same evening or during the early morning hours of the following day and informed her that the defendant had requested to see her. Ms. Shaw stated that neither Deputy Director Armstrong nor any other officer asked her to obtain information from the defendant for them, told her what to say to the defendant, or instructed her to question him. Ms. Shaw said that no one else was in the room when she spoke with her son. At the conclusion of Ms. Shaw's testimony, the trial court denied the defendant's motion to suppress.

Because the defendant failed to file his suppression motion prior to trial, as Rule 12(b)(2)(C) requires, and also failed to raise the issue in his motion for new trial, plain error review applies to this issue. Our review is less hampered than when no motion to suppress at all is filed because, in this case, the trial court conducted a hearing on the defendant's late-filed motion to suppress and allowed both parties to make a record. Still, the existing record is simply devoid of any evidence to show, or even to suggest, that the defendant's mother was acting as a state agent when she spoke with him. The defendant initiated the contact with his mother by asking to see her *after* Deputy Director Armstrong had properly ceased the interrogation in response to the defendant's invocation of his right to counsel. In Arizona v. Mauro, 481 U.S. 520, 526 (1987), the United States Supreme Court indicated that a private third party's questioning of a person in police custody may perhaps constitute the functional equivalent of police interrogation if certain circumstances are present. But none of those circumstances are present in this case.

---

[28] The defendant had not been charged with a criminal offense at the time he invoked his right to counsel; thus, the defendant's right to counsel under the Sixth Amendment to the United States Constitution had not attached. Climer, 400 S.W.3d at 566 n.15.

In Mauro, the defendant told the police that he had killed his son and then directed them to the child's body. Id. at 522-23. After being advised of his Miranda rights, the defendant invoked his right to counsel. Id. at 523. The police then allowed the defendant to meet with his wife but only in the presence of an officer, who tape-recorded the conversation. Id. Despite the officer's presence and the fact that the conversation had been recorded, the Mauro Court held that the wife's questioning of the defendant did not constitute police "interrogation." Id. at 527-28. The Court reasoned that no evidence showed that the police sent the defendant's wife in to meet with him for the purpose of eliciting incriminating statements. Id. at 528. The Court considered the situation from the defendant's perspective and concluded that it was unlikely the defendant would have felt "that he was being coerced to incriminate himself" by his wife's presence. Id. As a result, the Court concluded that the decision to allow the defendant's wife to see him was not "the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation." Id. at 527 (footnote omitted). Thus, in the absence of "compelling influences, psychological ploys, or direct questioning," the Mauro Court concluded that the "possibility" that an accused will incriminate himself or an officer's subjective "hope" that he will do so is not the functional equivalent of interrogation. Id. at 528-29.

In the present case, there was no evidence at all suggesting that the police brought Ms. Shaw to see the defendant "for the purpose of eliciting incriminating statements," see id. at 528, or that the officers asked, directed, induced, or threatened her to obtain information from the defendant. According to Ms. Shaw's own testimony, the officers escorted her to the interview room, where she and the defendant were allowed to speak to each other unsupervised. Ms. Shaw said that the officers did not instruct her on what to say to or ask of the defendant. As the United States Supreme Court emphasized in Mauro:

> In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions . . . [was] preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. . . . *Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must they ignore legitimate security concerns by allowing spouses to meet in private.*

Id. at 529-30 (emphasis added).

The record in this case demonstrates only that the police granted the defendant's request to talk with his mother, Ms. Shaw. Nothing in the record supports the defendant's claim that Ms. Shaw was acting as a state agent or that Ms. Shaw's conversation with the

defendant amounted to interrogation. See State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996); State v. Johnson, No. M2011-00792-CCA-R3-CD, 2012 WL 3731699, at *12-15 (Tenn. Crim. App. Aug. 29, 2012). Again, the defendant has failed to establish any breach of a clear rule of law and is not entitled to relief on this issue under the plain error doctrine.

### B. Testimony Regarding Invocation of Constitutional Rights

The defendant next argues that the State's introduction of evidence in its case-in-chief about his invocation of his federal and state constitutional rights to remain silent and to an attorney amounted to constitutional error. He asserts that the error was not harmless and entitles him to a new trial. The State responds that the testimony about which the defendant complains was properly introduced in response to defense cross-examination of prosecution witnesses about why the police failed to obtain a formal statement from the defendant or to ask him more specific questions about the crime scene. The State says the prosecution did not rely upon or ask the jury to consider the defendant's invocation of his right to counsel as evidence of guilt.

### 1. Evidence of Defendant's Invocation of Constitutional Rights

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court announced procedural safeguards to protect a defendant's Fifth Amendment rights during custodial interrogation. Dickerson v. United States, 530 U.S. 428, 444 (2000) (holding that Miranda announced a binding "constitutional rule" under the Fifth Amendment). Ten years later, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment forbids impeachment of a defendant at trial for choosing to exercise his Fifth Amendment right to remain silent after receiving Miranda warnings. Doyle v. Ohio, 426 U.S. 610, 619-20 (1976); State v. Frasier, 914 S.W.2d 467, 471 (Tenn. 1996).[29]

In Doyle, the defendants remained silent upon arrest, and the Supreme Court held that using a defendant's post-Miranda silence to impeach the defendant at trial violates the Due Process Clause of the Fourteenth Amendment. Doyle, 426 U.S. at 619; see also State v. Flanagan, 443 S.W.2d 25, 26 (Tenn. 1969) (holding that proof of a defendant's silence or assertion of a right to remain silent during questioning about participation in criminal acts is not admissible as evidence from which an inference of guilt may be drawn). The Doyle Court reasoned that "it would be fundamentally unfair and a deprivation of [D]ue [P]rocess

---

[29] The Supreme Court has since held, however, that introducing evidence of a defendant's pre-custodial, pre-Miranda silence does not violate the Fifth Amendment where the defendant did not expressly invoke the right to remain silent as the reason for his silence. Salinas v. Texas, __ U.S. __, 133 S.Ct. 2174, 2181-82 (2013).

to allow [an] arrested person's silence to be used to impeach an explanation subsequently offered at trial." Doyle, 426 U.S. at 618.

Subsequently, in Wainwright v. Greenfield, 474 U.S. 284 (1986), the Supreme Court revisited Doyle and again condemned a "breach[ ][of] the implied assurance of the Miranda warnings [as] an affront to the fundamental fairness that the Due Process [C]lause requires." Id. at 291. In Greenfield, after the defendant entered a plea of "not guilty by reason of insanity," the prosecution was permitted to introduce evidence that he had "exercised his right to remain silent and . . . expressed a desire to consult counsel before answering any questions." Id. at 287. Later in closing argument and over the objection of defense counsel, the prosecutor reminded the jury of the defendant's silence and "suggested that [his] repeated refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension . . . inconsistent with . . . insanity." Id. at 287.

In reversing the conviction, the Supreme Court in Greenfield emphasized that "[t]he point of . . . Doyle . . . is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter . . . us[e] the silence to impeach [him]" or otherwise "make use of the . . . exercise of those rights in obtaining his conviction." Id. at 292. Thus, the Court declared that "[w]hat is impermissible is the *evidentiary use* of an individual's exercise of his constitutional rights after the . . . assurance" of Miranda. Id. at 295 (emphasis added). The Court also noted that, "[w]ith respect to post-Miranda warnings . . . [the term] silence does not mean only muteness; it includes the statement . . . of a desire to remain silent until an attorney has been consulted." Id. at 295 n.13; see also State v. Hines, 919 S.W.2d 573, 580-81 (Tenn. 1995) (recognizing that a prosecutor may not use a defendant's exercise of his constitutional right to counsel to penalize the defendant at trial).

Within a year of Greenfield, the Supreme Court was, once more, confronted with a Doyle issue. In Greer v. Miller, 483 U.S. 756 (1987), the appeal resulted from a prosecutorial question to a witness which "touched upon [the defendant's] postarrest silence." Id. at 764. Unlike in Doyle and Greenfield, however, the trial court sustained Miller's prompt objection to the question, instructed the jury to "ignore" it, and allowed no "further questioning or argument with respect to [the defendant's] silence[.]" Id. at 759, 764. In applying Doyle, the Supreme Court deemed it "significant that in each of the cases in which [the] Court ha[d previously] applied Doyle, the trial court . . . permitted specific inquiry or argument respecting the defendant's post-Miranda silence." Id. at 764. Because "Miller's post-arrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference," the Court determined that "no Doyle violation occurred." Id. at 764-65. Greer thus teaches that "Doyle does not impose a prima facie bar against any mention whatsoever of a defendant's right to request counsel, but instead guards

-57-

against the exploitation of that constitutional right by the prosecutor." Lindgren v. Lane, 925 F.2d 198, 202 (7th Cir. 1991).

The Seventh Circuit in Lindgren was confronted with a record that very much resembles the record in this appeal. There, a police officer made mention of Mr. Lindgren's request for counsel during direct examination by the prosecutor, and the trial court denied defendant's ensuing motion for a mistrial. Id. at 202. In affirming the trial court, the Seventh Circuit reiterated that a Doyle inquiry "center[s] . . . around the particular use to which the post-arrest silence is being put[ ]" and, therefore, requires consideration of the particular circumstances of each case. Id. The Seventh Circuit concluded that because the officer's testimony regarding Mr. Lindgren's request for counsel was inadvertent and because the prosecutor did not *use* the testimony to impeach the defendant or argue his guilt to the jury, there was no violation of Greenfield and Doyle. Id. at 202; see also Noland v. French, 134 F.3d 208, 216 (4th Cir. 1998) (holding that there was no Greenfield or Doyle error where the prosecution twice elicited testimony from police officers that the defendant understood his Miranda rights and exercised them, pointing out that the defense did not object to the testimony at trial and that the prosecutor's questions did not draw attention to the defendant's silence or invocation of his right to counsel); Jones v. Stotts, 59 F.3d 143, 146 (10th Cir. 1995) (holding that "it is the prosecutor's exploitation of a defendant's exercise of his right to silence which is prohibited"); United States v. Stubbs, 944 F.2d 828, 834-35 (11th Cir. 1991) (finding no Greenfield or Doyle violation "when the government does not specifically and expressly attempt to use . . . the improper comment to impeach the defendant"); Cook v. State, 544 N.E.2d 1359, 1363 (Ind. 1989) (holding that testimony by a federal agent that there was no further contact with the defendant at a certain point because he "had made a request to speak to an attorney" did not constitute a Doyle violation); State v. Baccam, 476 N.W.2d 884, 886-87 (Iowa Ct. App. 1991) (finding no abuse of discretion in the trial court's refusal to grant a mistrial on the basis of a single comment related to the defendant's post-Miranda silence where the trial court gave a curative instruction and the silence was not used against the defendant); Pulley v. Commonwealth, 525 S.E.2d 51, 54 (Va. Ct. App. 2000) (holding that there was no Doyle violation from a police officer's nonresponsive comment that the defendant invoked his right to counsel because the prosecution did not exploit the issue). As explained below, we likewise conclude that there was no violation of Greenfield or Doyle in this case.

*2. Right to Remain Silent*

Defendant first claims that Deputy Director Armstrong improperly commented upon his invocation of his right to remain silent. We have already concluded that the defendant

did not invoke his right to remain silent, so this claim necessarily fails. Deputy Director Armstrong's challenged testimony[30]

---

[30] Deputy Director Armstrong testified on direct examination:

Q.    If you would, explain to the jury how you ended up coming into contact personally with [the defendant]?

A.    I watched the interview of Sergeant Mason and Sergeant Max's interview with [the defendant], during which he shut down on them and didn't want to talk to the two of them anymore. I then made a decision that I would go in and conduct the investigation—conduct the interview myself.

. . . .

Q.    Tell the jury what you did when you walked into the room with [the defendant] and take them through kind of how you talked to him and what he was telling you.

A.    I walked in and I introduced myself. I told him I was Lieutenant Armstrong. I actually pulled up another chair and put my feet up in it and kind of leaned back and we just talked. We talked about how horrific this crime was. I watched his body language. At that point he seemed as if he was really, really tight, like he was doing everything he could not to talk to me. If I asked him a question, his answers were one-word answers, maybe one-or-two-word answers. He wouldn't engage me in open conversation. Most of the time if I asked him a question, he would nod his head or shake his head. But you could tell he was doing everything he could not to engage me in an open conversation as to where we had open dialogue back and forth with each other.

The State later questioned Deputy Director Armstrong as follows:

Q.    So you had this background information and then you went to talk to [the defendant]. Explain to the jury how the interview went, some of the things that you continued to say and what you talked about with [the defendant].

A.    Like I said, I walked into the interview room. I introduced myself. I pulled up a chair. I propped up my feet and we basically started talking and I asked Jessie to tell me some of the things that are important to you. He said my family. We talked about religion. I asked him whether or not he believed in God. He told me that he did. I asked him whether or not he believed in heaven and hell. He told me that he did. I could tell that he was almost like he was struggling to try to maintain his composure. There [were] several times that we talked it was almost —he leaned forward as if I want to tell you something but he'd get his self [sic] together and he'd lean back. So I could tell he was hiding something. I could tell he was doing everything he could, like I said, not to engage me in open conversation because he

(continued...)

-59-

merely informed the jury of the circumstances that caused him to conduct the defendant's interview. He also described the defendant's demeanor during the interview. The defendant did not object to this testimony at trial and did not raise this issue in his motion for new trial. The defendant is again limited to seeking relief via plain error review and is not entitled to relief because he has failed to establish that a clear and unequivocal rule of law was breached. Johnson, 743 S.W.2d at 158 ("[W]here the answers to questions are admissible, the demeanor and behavior of the person giving the statement may be commented upon by witnesses who were present.").

### 3. Right to Counsel

#### a. Sergeant Mullins's Testimony

We also reject the defendant's argument that Sergeant Mullins's testimony and that of Deputy Director Armstrong about the defendant's invocation of his right to counsel was improper and deprived him of a fair trial.

The defendant challenges a very minor portion of Sergeant Mullins's lengthy, multi-day testimony, and the portion he challenges was provided on cross-examination in response to defense counsel's questions regarding issues about the importance of the defendant's statement to the police; the importance of documenting the defendant's responses; the Memphis Police Department's practice of not recording statements; the lack of a typewritten formal statement; the questions that should have been asked the defendant regarding the crime scene; and the questions that Sergeant Mullins would have asked the defendant about the crime scene had Sergeant Mullins interviewed the defendant. The relevant portion of the testimony is reproduced below:

> Q.      If you were interviewing [the defendant] in this case and he told you where the knives and the guns went, would that have been important enough for you to write down?
>
> A.      Yes, sir. Again, if he told us where anything was, any evidence from this crime scene, just like the bicycle, we would have followed up. I don't see why anybody would not have. We followed up on everything that I know of that he said as far as his actions afterwards.
>
> . . . .

---

[30](...continued)
        was trying to keep—limit his words to the least as he could.

Q.     If you were interviewing [the defendant] and you asked him about grabbing hair or ripping beads out, would you have asked him that question and recorded his answer on paper? Would you have documented what was asked and what was said?

A.     If I was able to interview [the defendant], I would have asked a lot of questions before he asked for his attorney. Now how many questions he was asked before he asked for an attorney, I couldn't tell you. I would have asked a lot of questions before such time.

       . . . .

Q.     So you would have specifically after looking at the crime scene, you would have asked some questions about like holes in the cushion and you would have documented your question and your answer?

A.     Yes, sir. See, again, realize how this investigation went. The crime scene was kind of my job. And I did not at any point between the original call-out and the interview, arrest and interview of [the defendant], have a chance to sit down with anybody and say okay, here's what I found in this room, in this room and in this room. I didn't hardly stop in those four or five days. If I had been able to interview [the defendant], I would have had very different questions than anybody else on this case because I had more knowledge about that [the crime scene] than any of them did and did they know about certain things, yes, but specific small details, I know more about that than anybody else on the team.

As he did in the Court of Criminal Appeals, the defendant argues that Sergeant Mullins's testimony was not responsive to defense counsel's questions and that Sergeant Mullins improperly interjected references about the defendant's invocation of his right to counsel. We disagree. Again, the defendant did not object to Sergeant Mullins's testimony at trial on any basis and did not raise this issue in his motion for new trial. Therefore, we again apply plain error review to the defendant's claim and again conclude that the defendant has failed to show that a clear rule of law was breached.

Sergeant Mullins's isolated references to the defendant's invocation of his right to counsel were responsive to the broad questions defense counsel posed to Sergeant Mullins on cross-examination. Moreover, even if Sergeant Mullins's testimony was not responsive, the two isolated references to the defendant's invocation of his right to counsel do not violate

-61-

<u>Doyle</u> and <u>Greenfield</u> because the prosecution did not make any evidentiary use of the testimony or attempt to penalize the defendant for exercising his constitutional right.  <u>See</u> <u>Pulley</u>, 525 S.E.2d at 54 (holding that there was no <u>Doyle</u> violation from a police officer's nonresponsive comment that the defendant invoked his right to counsel where the prosecution did not exploit the issue).

### b. Deputy Director Armstrong's Testimony

During the State's direct examination of Deputy Director Armstrong, the following exchange occurred:

> Q.    Did you make any attempts to go into greater detail with [the defendant] about what occurred in that house based on what you knew from the crime scene?
>
> A.    I did.  From the crime scene I could tell some of the women's clothing had been altered and I asked him about that.  And as I tried to ask him additional questions about that, he asked for an attorney.
>
> Q.    He asked for a lawyer?
>
> A.    Yes, he did.

The defendant objected to this testimony and requested a mistrial.  The trial court denied the request for a mistrial, finding that the testimony was relevant "in light of the line of questioning that's been going on" and "in light of all the issues with regard to recorded statements, formal statements."  The trial court then instructed the jury as follows:

> Ladies and gentlemen, before we go any further, let me just say this to you.  Under our laws and under the Constitution of the United States, every person is entitled to have representation.  People are advised and in this case a person is advised of their rights.  They are advised that they have the right to talk to an attorney at any time.  Once they request the permission to talk to an attorney, all questions cease, okay.  There's no more questioning after that point.  Everybody has a right to that.  That is a right that is entitled to all of us as citizens of the United States.  You are to draw no conclusions from that, other than all questions cease at the point somebody says they want to talk to an attorney.  Does everybody understand that?  That's the only conclusion you may draw from that, all questions cease at that point.

The State then questioned Deputy Director Armstrong as follows:

Q.      And on that note, . . . you weren't []able to get a formal written statement from [the defendant] because he stopped the interview?

A.      He did stop.

Deputy Director Armstrong also mentioned the defendant's request for counsel during cross-examination in the following exchange with defense counsel:

Q.      When I asked you about the comment [the defendant] made to you that you lied to me, would that be something important enough to put into your supplement, Deputy Director Armstrong?

A.      I don't see where it's relevant, no, sir.

Q.      So it's not important?

A.      I don't see where it's relevant as far as what if you decide—no, sir. At that point when he decided that he wanted an attorney, we ceased the interview.

When defense counsel later questioned Deputy Director Armstrong about the lack of details in the defendant's confession, the following exchange occurred:

Q.      Okay. What did [the defendant] tell you he did with the boards that were in the house?

A.      The only weapons that we ever discussed were pistols and the knives. Again, we did not get a chance to get into specifics where I was able to sit down and ask him specific questions to get specific answers from him because by the time we got to that point, he requested an attorney and I ceased the interview.

The defendant submits that the trial court erred in denying his motion for a mistrial because Deputy Director Armstrong's testimony violated Doyle and Greenfield. We disagree.

As the trial court stated when overruling the defense motion for a mistrial, the defense had attacked the police investigation as incompetent and incomplete throughout the trial.

The defense had repeatedly questioned police witnesses about the lack of a detailed, formal, and recorded statement from the defendant. These questions were phrased in a manner that implied the lack of detail in the defendant's confession stemmed from police incompetence or police negligence in failing to record the defendant's responses accurately. Deputy Director Armstrong was one of the last police witnesses to testify in the prosecution's case-in-chief. The prosecutor, having heard the defense's cross-examination of each prior police witness, did not err by asking Deputy Director Armstrong on direct examination whether he made any attempts to obtain a more detailed statement from the defendant. The prosecutor did not directly ask Deputy Director Armstrong about the defendant's invocation of his right to counsel. The question that was asked was a fair response to the defense theory and questioning throughout the trial to that point. The trial court provided an appropriate instruction limiting the jury's consideration of Deputy Director Armstrong's mention of the defendant's invocation of his right to counsel, which we must presume the jury followed. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006). The prosecution's use of the testimony regarding the defendant's request for counsel was appropriately limited to rebutting the defense theory at trial. See United States v. Robinson, 485 U.S. 25, 32 (1988) (holding that prosecutors are not prohibited from commenting upon a defendant's decision not to testify at trial so long as the prosecutorial comment is simply a "fair response" to defense claims and the prosecutorial comment does not treat the defendant's silence as "substantive evidence of guilt"); State v. Cazes, 875 S.W.2d 253, 267 (Tenn. 1994) (applying Robinson to reject a Griffin claim). The prosecution attempted neither to create an inference of guilt from the defendant's request for counsel nor to use the defendant's request for counsel to impeach his trial testimony. Considering all the relevant circumstances, we conclude that Deputy Director Armstrong's testimony did not violate the Doyle and Greenfield constitutional rules. See Parks v. State, 543 S.W.2d 855, 857 (Tenn. Crim. App. 1976) (declining to find a Doyle violation where the officer's statement about the defendant's refusal to respond to police questioning was merely a comment on the scope of the defendant's statements and not a reference to the refusal of the defendant to make any statement at all").

The defendant also challenges the State's comment during rebuttal closing argument that "[w]hen [the defendant] was brought down to the police department, he could have cleared it all up[,] [b]ut he didn't" as a comment on the defendant's exercise of his right to remain silent. Again, we disagree. Rather than a comment on the defendant's exercise of his right to remain silent, the prosecutor's statement reminded the jury of the contents of the defendant's post-arrest confession to Deputy Director Armstrong and the defendant's admissions to his mother. The purpose of the prosecutor's statement was to highlight the discrepancies between the defendant's post-arrest confession and admissions and his testimony at trial. The prosecutor was not commenting upon the defendant's exercise of his constitutional rights. The prosecutor's statement did not violate Doyle or its progeny. Morgan v. State, 755 N.E.2d 1070, 1075 (Ind. 2001) ("Although evidence of a defendant's

post-<u>Miranda</u> silence is generally not admissible, the defendant may open the door to its admission").

Finally, we agree with the Court of Criminal Appeals that, even if Deputy Director Armstrong's testimony regarding the defendant's request for counsel was constitutionally improper, the error was harmless beyond a reasonable doubt. The defense had already elicited testimony about the defendant's request for an attorney during Sergeant Mullins's cross-examination. The defense did not object to or move to strike Sergeant Mullins's testimony. Deputy Director Armstrong's testimony was merely cumulative to the proof already elicited by the defense. <u>See</u> <u>Johnson</u>, 743 S.W.2d at 158-59 (finding that any error in the police officer's brief references to the defendant asking to consult with counsel while making a statement was harmless beyond a reasonable doubt).

### C. Confrontation Clause Claims

The defendant argues that the admission of testimony from several police officer witnesses and the admission of autopsy reports prepared by a medical examiner who did not testify, as well as the admission of expert testimony about those autopsies, violated his state and federal constitutional right to confront the witnesses against him. Alternatively, the defendant argues that the testimony from the police officers amounted to hearsay and violated the Tennessee Rules of Evidence. The State argues that the defendant's failure to object on constitutional grounds limits this Court to conducting plain error review and that the defendant is not entitled to relief because the testimony and autopsy reports were properly admitted. We will first summarize the governing legal principles and then apply those principles to each of the defendant's claims.

### 1. Right of Confrontation

The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965), directs that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Article I, section 9 of the Tennessee Constitution similarly provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face." Tenn. Const. art. I, § 9. The phrasing of the state constitutional provision differs from the text of the Sixth Amendment and has been described as imposing "a higher right than that found in the federal constitution." <u>State v. Deuter</u>, 839 S.W.2d 391, 395 (Tenn. 1992). However, when deciding claims based on the right of confrontation provided in article I, section 9, we have expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment. <u>State v. Parker</u>, 350 S.W.3d 883, 898 (Tenn. 2011); <u>State</u>

v. Franklin, 308 S.W.3d 799, 809-10 (Tenn. 2010); State v. Cannon, 254 S.W.3d 287, 301 (Tenn. 2008); State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007).[31] Thus, we will unitarily analyze the defendant's federal and state constitutional claims, as the same standards govern both.

Any discussion of current Confrontation Clause jurisprudence necessarily begins with Crawford v. Washington, 541 U.S. 36 (2004), in which the Supreme Court abrogated the test that had been used for twenty-five years[32] and announced a new mode of analysis. After examining the historical underpinnings of the Confrontation Clause, id. at 43-50, the Crawford Court described "the principal evil at which the Confrontation Clause was directed" as "the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." Id. at 50. The text of the Confrontation Clause reflects this concern, the Crawford Court said, by focusing on "'witnesses'" against the accused—in other words, those who "'bear testimony'" against an accused. Id. at 51 (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). "'Testimony,'" the Supreme Court explained, "'is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Id. (quoting 2 Noah Webster, An American Dictionary of the English Language (1828)). Thus, the Supreme Court concluded that the Confrontation Clause precludes the admission of "[t]estimonial statements of witnesses absent from trial," unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. Id. at 59. The Court held:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . . Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

Id. at 68. Crawford thus instructs that testimonial statements are "inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 300 (2009) (citing Crawford, 541 U.S. at 54).

---

[31] The defendant has not argued that the Tennessee Constitution affords greater protection or that a different standard governs our analysis of his state constitutional claim.

[32] Before Crawford, Confrontation Clause challenges to the admissibility of out-of-court statements of an unavailable witness were governed by Ohio v. Roberts, 448 U.S. 56 (1980).

Two years after <u>Crawford</u>, the Supreme Court held that the Confrontation Clause applies only to testimonial hearsay and does not apply to nontestimonial hearsay. <u>Davis v. Washington</u>, 547 U.S. 813, 823-24 (2006); <u>see also</u> <u>Whorton v. Bockting</u>, 549 U.S. 406, 420 (2007) (stating that the Confrontation Clause has "no application" to nontestimonial hearsay). Thus, the threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial. <u>Cannon</u>, 254 S.W.3d at 301.

The <u>Crawford</u> Court declined to "spell out a comprehensive definition of 'testimonial[,]'" <u>Crawford</u>, 541 U.S. at 51, providing instead the following illustrative list of the "core class of 'testimonial' statements" to which the Confrontation Clause applies:

> [(1)] [E]x parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially. . .; [(2)] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions. . .; [and (3)] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

<u>Id.</u> at 51-52 (citations and quotation marks omitted).

The <u>Crawford</u> Court also identified certain types of statements that "by their nature [are] not testimonial—for example, business records or statements in furtherance of a conspiracy," which therefore do not implicate the Confrontation Clause. <u>Id.</u> at 56. The <u>Crawford</u> Court emphasized also that the Confrontation Clause places "no constraints at all" on the use of prior testimonial statements of a declarant who is present and available on cross-examination to defend or explain prior testimonial statements. <u>Id.</u> at 59 n.9 (citations omitted); <u>accord</u> <u>State v. Banks</u>, 271 S.W.3d 90, 118-19 (Tenn. 2008) (interpreting article I, section 9 as not applying to testimonial statements when a declarant appears for cross-examination at trial). Furthermore, the <u>Crawford</u> Court explained that the Confrontation Clause is not violated when testimonial statements are admitted for purposes other than establishing the truth of the matter asserted. <u>Crawford</u>, 541 U.S. at 59 n.9; <u>accord</u> <u>State v. Franklin</u>, 308 S.W.3d at 808-811 (citing state and federal decisions which found no Confrontation Clause violation where the out-of-court statement—whether testimonial or not—was admitted for some purpose other than the truth of the matter asserted).

Since Crawford, the Supreme Court has still not "attempt[ed] to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial . . . ." Davis, 547 U.S. at 822. However, in Davis the Supreme Court instructed that the "primary purpose" of a statement marks the relevant dividing line between the two categories, explaining:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances *objectively indicate* that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Id. (emphasis added). When determining a statement's primary purpose, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Michigan v. Bryant, 562 U.S. ———, 131 S. Ct. 1143, 1156 (2011) (holding that, under the circumstances, the police interrogation of a shooting victim had the primary purpose of responding to the emergency of a roaming gunman and, thus, the elicited statements were not testimonial).

Neither Crawford nor Davis nor Bryant involved expert proof, but three more recent Supreme Court decisions address such proof and are pertinent to our analysis of the issues the defendant has raised in this appeal. Williams, 567 U.S. ___, 132 S. Ct. 2221 (2012); Bullcoming v. New Mexico, ___ U.S.___, 131 S. Ct. 2705 (2011); Melendez–Diaz v. Massachusetts, 557 U.S. 305 (2009). We begin with the first decision in the series.

In Melendez–Diaz, the Supreme Court applied the primary purpose test to the notarized "certificates of analysis" that described the results of forensic testing performed by analysts of the Massachusetts State Laboratory Institute. 557 U.S. at 308-09. The fact at issue in the criminal trial was whether the substance the defendant possessed was cocaine, and the certificates stated that the substance was in fact cocaine. Thus, the Court held that the "certificates of analysis" were "quite plainly affidavits[,]" which fell within the "core class of testimonial statements" described in Crawford. Melendez–Diaz, 557 U.S. at 310-11 (citations and internal quotation marks omitted). The notarized certificates, the Court said, amounted to a "solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 310 (citing Crawford, 541 U.S. at 51). The Court also reasoned that the affidavits were made for "the sole purpose" of providing "prima facie evidence of

the composition, quality, and the net weight of the analyzed substance." Id. at 311 (citations omitted). The Supreme Court concluded that the certificates were "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'" Id. (quoting Davis, 547 U.S. at 830 (emphasis omitted)). As a result, the certificates "were testimonial statements, and the analysts were 'witnesses' for the purposes of the Sixth Amendment." Id. at 311. Thus, the Supreme Court held that,"[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them, [the defendant] was entitled to 'be confronted with' the analysts at trial." Id.

Observing that "[c]onfrontation is one means of assuring accurate forensic analysis," and, indeed, the only means constitutionally guaranteed, the Supreme Court held that "[f]orensic evidence is not uniquely immune from the risk of manipulation." Id. at 318. Because many labs are administered by law enforcement agencies, "[a] forensic analyst responding to a request from a law enforcement official may feel pressure—or have an incentive—to alter the evidence in a manner favorable to the prosecution." Id.

The Supreme Court noted that the analysts' affidavits merely identified the substance as cocaine and provided no information about "what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." Id. at 320. The Supreme Court explained that "[a]t least some of that methodology [the analysts used] require[d] the exercise of judgment and present[ed] a risk of error that might be explored on cross-examination." Id. Thus, the Court found "little reason to believe that confrontation [would] be useless in testing [the] analysts' honesty, proficiency, and methodology—the features that are commonly the focus in the cross-examination of experts." Id. at 321.

The Supreme Court returned to the subject of the Confrontation Clause and forensic reports in Bullcoming v. New Mexico. There, the police arrested the defendant on charges of driving while intoxicated. 131 S. Ct. at 2709. The prosecution submitted a forensic laboratory report certifying Bullcoming's blood-alcohol concentration as a business record. Id. at 2712. Instead of calling the analyst who signed the certification, who was on unpaid leave for undisclosed reasons, the prosecution "called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." Id. at 2709. The testifying analyst and the certifying analyst both worked for the New Mexico Department of Health's Scientific Laboratory Division. Id. at 2710, 2712. The Supreme Court rejected the argument that substitute testimony satisfied the constitutional requirement because the tests themselves were reliable, explaining that "the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity

of Mother Teresa.'" Id. at 2715 (quoting Melendez-Diaz, 557 U.S. at 319 n.6). The Supreme Court declared that the Confrontation Clause "does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination." Id. at 2716. The Court noted that "the formalities attending the 'report of blood alcohol analysis' [were] more than adequate to qualify [the certifying analyst's] assertions as testimonial." Id. at 2717.

As part of its analysis in Bullcoming, the Supreme Court pointed out that operating the machine used to conduct the test required "specialized knowledge and training" and that human error can occur at several points during the testing process. Id. at 2711. Furthermore, the testifying analyst "could not convey what the [certifying analyst] knew or observed about the events his certification concerned, i.e., the particular test and testing process he employed. Nor could such surrogate testimony expose any lapses or lies on the certifying analyst's part." Id. at 2715 (footnotes omitted). On the other hand, the certifying analyst's "testimony under oath would have enabled Bullcoming's counsel to raise before [the] jury questions concerning [the certifying analyst's] proficiency, the care he took in performing his work, and his veracity." Id. at 2715 n.7.

Justice Sotomayor, who provided the fifth vote for the majority opinion in Bullcoming, wrote a separate opinion to clarify her view that the report was testimonial because its primary purpose was evidentiary and "to emphasize the limited reach of the Court's opinion." Id. at 2719 (Sotomayor, J., concurring). She noted that the surrogate analyst was not "a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue." Id. at 2722. She opined that "[i]t would [have been] a different case if, for example, a supervisor who observed an analyst conducting a test testified about the results or a report about such results." Id. She noted that the lead opinion in Bullcoming had not addressed the "degree of involvement" that would be sufficient to allow a supervisor to testify because the surrogate analyst who testified "had no involvement whatsoever in the relevant test and report." Id. Justice Sotomayor also noted that Bullcoming was "not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence," id., which she viewed also as a "different question." Id.

Most recently, in Williams v. Illinois, 567 U.S. ——, 132 S. Ct. 2221 (2012), the Supreme Court considered whether Crawford bars an expert from expressing an opinion based on facts gleaned from a laboratory report, when the expert lacks firsthand knowledge regarding the preparation of the report. The hearsay evidence at issue in Williams was a DNA profile prepared by an outside laboratory, Cellmark, using vaginal swabs collected from the crime victim's rape kit. Id. at 2227. A state police DNA analyst searched the

state's DNA database and matched the profile Cellmark prepared to a profile of the defendant's DNA taken upon his earlier arrest on an unrelated matter. Id. at 2229. At trial, over a defense Confrontation Clause objection, the police DNA analyst was permitted to testify that the defendant's DNA profile in the state database matched the male DNA profile Cellmark had developed from semen on the victim's vaginal swabs. Id. at 2230. Cellmark's written report, on which the state police DNA analyst based her testimony, was not itself introduced in evidence. Id. at 2231. No witness having personal knowledge of Cellmark's development of the DNA profile from the vaginal swab testified at trial. Id. at 2229–31.

Justice Alito authored a plurality opinion in Williams, which Chief Justice Roberts and Justices Kennedy and Breyer joined. The plurality reasoned that the Cellmark report was not testimonial because it did not have "the primary purpose of accusing a targeted individual." Id. at 2243. The plurality explained that, because no one had been identified as a suspect when the report was prepared, the primary purpose of Cellmark's DNA testing was not "to accuse petitioner or to create evidence for use at trial" but, rather, "to catch a dangerous rapist who was still at large." Id. The plurality thus viewed Cellmark's report as analogous to statements made "to enable police assistance to meet an ongoing emergency" or "to bring an end to an ongoing threat," which the Court previously had held not to be testimonial. Id. Given their non-accusatory role, the plurality reasoned that the Cellmark scientists had "no incentive to produce anything other than a scientifically sound and reliable profile." Id. at 2244.

Justice Thomas provided the fifth vote in support of the Williams judgment. Justice Thomas actually rejected what he called the plurality's "new primary purpose test," under which, he said, even a statement with a primarily evidentiary purpose is testimonial only if it is meant to incriminate a particular known individual, as "lack[ing] any grounding in constitutional text, in history, or in logic." Id. at 2262 (Thomas, J., concurring in the judgment). Among other things, Justice Thomas argued that the targeted-accusation requirement made "little sense" because "[a] statement that is not facially inculpatory may turn out to be highly probative of a defendant's guilt when considered with other evidence." Id. at 2263. Nonetheless, Justice Thomas concurred with the plurality's conclusion that the Cellmark report was not testimonial. While he "agree[d] that, for a statement to be testimonial within the meaning of the Confrontation Clause, the declarant must primarily intend to establish some fact with the understanding that his statement may be used in a criminal prosecution," Justice Thomas deemed that to be only one "necessary criterion," not the "sufficient" one. Id. at 2261. Justice Thomas explained that to be testimonial, a statement must satisfy the additional requirement of possessing sufficient "'indicia of solemnity,'" id. at 2259 (quoting Davis, 547 U.S. at 836-37), which the Cellmark report failed to do. According to Justice Thomas, only "'formalized testimonial materials,' such as depositions, affidavits, and prior testimony, or statements resulting from 'formalized

dialogue,' such as custodial interrogation," satisfy that additional necessary criterion. Id. at 2260 (internal quotation marks omitted). The Cellmark report, Justice Thomas concluded, was "neither a sworn nor a certified declaration of fact," and "although the report was produced at the request of law enforcement, it was not the product of any sort of formalized dialogue resembling custodial interrogation." Id.

Justice Kagan, in an opinion joined by Justices Scalia, Ginsburg, and Sotomayor, dissented. Williams, 132 S.Ct. at 2264 (Kagan, J., dissenting). The dissenters joined Justice Thomas in rejecting the plurality's targeted "'accusation'" test on multiple grounds, which means that a majority of the Court, consisting of Justice Thomas and the Williams dissenters, rejected that test. Id. at 2274. Among other things, the dissenters observed that for purposes of the Confrontation Clause "it makes not a whit of difference whether, at the time of the laboratory test, the police already have a suspect" because "the typical problem with laboratory analyses—and the typical focus of cross-examination—has to do with careless or incompetent work, rather than with personal vendettas" or a particular analyst's dishonesty. Id. Unlike the plurality, the dissenters did not view the analysis Cellmark performed as necessary "to catch a dangerous rapist who was still at large" and analogous to the statements Davis and Bryant held to be nontestimonial. Id. The dissenters argued that comparing the Cellmark analysis to those statements stretched the ongoing emergency test and the facts of Williams "beyond all recognition." Id.

The dissenters also rejected Justice Thomas's formality criterion, describing it as granting "constitutional significance to minutia, in a way that can only undermine the Confrontation Clause's protections" by enabling prosecutors to evade the constitutional imperative "by using the right kind of forms with the right kind of language," so that no forensic report would be formal enough to constitute a testimonial statement. Id. at 2276 ("It would not take long to devise the magic words and rules—principally, never call anything a 'certificate.'").

The dissenters viewed Williams as an "an open-and-shut case," id. at 2265, if the Court "adher[ed] to the simple rule" established in earlier Confrontation Clause precedents. Id. at 2265. The dissenters concluded that the Cellmark report was testimonial because it was made to establish "'some fact' in a criminal proceeding," specifically the identity of the rapist. Id. at 2266 (quoting Bullcoming, 131 S. Ct. at 2716). The dissenters concluded that allowing an expert who had no knowledge of the report to testify at Williams's trial violated his Sixth Amendment right to confront the witnesses against him. Id. at 2268.

The Supreme Court's fractured decision in Williams provides little guidance and is of uncertain precedential value because no rationale for the decision—not one of the three proffered tests for determining whether an extrajudicial statement is testimonial—garnered

the support of a majority of the Court. Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66 (1996) (stating that a decision is "of questionable precedential value" when "a majority of the Court expressly disagree[s] with the rationale of the plurality"); United States v. Pink, 315 U.S. 203, 216 (1942) (stating that while a decision which merely affirms a judgment "by an equally divided court" is "conclusive and binding upon the parties as respects that controversy" the lack of majority agreement "on the principles of law involved prevents it from being an authoritative determination for other cases").

It is true that typically "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" Marks v. United States, 430 U.S. 188, 193 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15 (1976)). The Marks rule presupposes, however, that the narrowest concurrence will represent a "common denominator" rationale. King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991). If one opinion "does not fit entirely within a broader circle drawn by the others," the Marks approach ceases to function as it was intended, and adhering to it in such circumstances would "turn a single opinion" to which "eight of nine Justices do not subscribe" into law. King, 950 F.2d at 782.

The Marks rule ceases to function as it was intended where Williams is concerned because the two opinions that resulted in the judgment share no common denominator rationale. Neither the plurality's rationale nor Justice Thomas's rationale is subsumed within the other, nor is one rationale narrower than the other in any relevant way that we can discern. For example, a statement could be made for the purpose of accusing a targeted individual, and therefore be testimonial under the plurality's test, but not be sufficiently formal to qualify as a testimonial statement under Justice Thomas's test. Conversely, a statement could be sufficiently formal to satisfy Justice Thomas's test but not be sufficiently targeted to satisfy the plurality's test.

Regardless of our inability to apply Marks, we agree with the District of Columbia Court of Appeals's reading of Williams:

By analogy to Marks, it can be argued that while [the plurality's] rationale and Justice Thomas's rationale may not be includible within each other, the different tests they utilize to determine whether a statement is testimonial are subsumed within and narrower than the dissenters' test. That is so because [the plurality] and Justice Thomas each added an additional requirement to the basic "evidentiary purpose" test espoused by [the dissenters]. If the four-Justice plurality would deem a statement testimonial under the targeted accusation test, the four dissenting Justices surely would deem it testimonial

-73-

under the broader evidentiary purpose test. Similarly, if Justice Thomas would deem a statement testimonial employing his formality criterion along with the evidentiary purpose test, the four dissenting Justices necessarily would deem it testimonial using the evidentiary purpose test alone. It therefore is logically coherent and faithful to the Justices' expressed views to understand <u>Williams</u> as establishing—at a minimum—a sufficient, if not a necessary, criterion: a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the plurality's targeted accusation requirement or Justice Thomas's formality criterion. Otherwise put, if <u>Williams</u> does have precedential value . . . an out-of-court statement is testimonial under that precedent if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.

<u>Young v. United States</u>, 63 A.3d 1033, 1043-44 (D.C. 2013); <u>see also</u> <u>State v. Michaels</u>, ___A.3d __, 2014 WL 3843299, at *17 (N.J. Aug. 6, 2014) ("In short, each of those three opinions in <u>Williams</u> embraces a different approach to determining whether the use of forensic evidence violates the Confrontation Clause, and there is no narrow rule that would have the support of a majority of the Supreme Court that we can discern from the opinions in <u>Williams</u>. Further, <u>Williams</u> advances a wholly new approach to when a forensic document will be deemed testimonial, and that approach diverges from the primary purpose test that had been applied previously. We find <u>Williams's</u> force, as precedent, at best unclear."). Having summarized the law related to Confrontation Clause claims, we turn to the facts of this case.

### 2. Autopsy Reports and Testimony about the Autopsy Reports

Relying primarily upon <u>Melendez-Diaz</u>, the defendant contends that the admission of three autopsy reports prepared by a medical examiner who did not testify and Dr. Funte's testimony about those reports violated his state and federal right to confront the witnesses against him.

The State first points outs that the defendant failed to object to the admission of the autopsy reports and also failed to raise the issue in his motion for new trial. The State is correct, and we are again constrained to utilize plain error review when considering this issue. The State contends that the defendant is not entitled to relief via the plain error doctrine because no clear rule of law was breached. The State points out that the law was unsettled at the time of the defendant's trial and remains unsettled as to the question of whether autopsy reports are or are not testimonial. We agree.

This case was tried in September 2010, after Melendez-Diaz, but prior to Bullcoming, and Williams.[33] As already noted, neither Crawford nor its progeny provided a comprehensive listing of statements that qualify as "testimonial." Furthermore, Melendez–Diaz did not decide the specific question of whether autopsy reports should be considered testimonial. The majority opinion's only reference to autopsy reports appeared in a footnote and was in response to the dissent's suggestion that the Confrontation Clause is not designed to detect errors in scientific tests, and that other methods such as a new test might better serve that purpose. The majority simply cited autopsies as an example of a forensic test that cannot be repeated. See Melendez-Diaz, 557 U.S. at 318 & n.5; see also id. at 337 (Kennedy, J., dissenting). The Supreme Court neither explicitly nor implicitly indicated whether autopsy reports are (or are not) testimonial in nature.[34] Thus, the issue remained unsettled. See, e.g., Nardi v. Pepe, 662 F.3d 107, 111 (1st Cir. 2011) ("[A]n autopsy report can be distinguished from, or assimilated to, the sworn documents in Melendez-Diaz."); id. at 112 ("[N]o one can be certain just what the Supreme Court would say about that issue today."); United States v. McGhee, 627 F.3d 454, 459 (1st Cir. 2010) (noting that the Melendez-Diaz Supreme Court was "sharply divided" and that the Court's "new slant on the Confrontation Clause is likely to be contested territory for some years"), vacated on reh'g on other grounds, 651 F.3d 153 (1st Cir. 2011); Martin v. State, 60 A.3d 1100, 1102 (Del. Supr. 2013) ("We recognize that substantial uncertainty exists about whether a particular statement is 'testimonial' or otherwise triggers the Confrontation Clause.").

Courts continue to be divided on the question of whether autopsy reports are testimonial statements or not. On the one hand, some courts have concluded that autopsy reports are not testimonial. See, e.g., United States v. James, 712 F.3d 79, 99 (2nd Cir. 2013)

_____

[33] The defendant's trial also occurred before the Court of Criminal Appeals rendered its decision in State v. Freeman, No. M2011-00184-CCA-R3-CD, 2012 WL 1656975, at *10-13 (Tenn. Crim. App. May 9, 2012), which concluded that the autopsy report introduced into evidence at Mr. Freeman's trial was testimonial. Freeman was decided after Melendez-Diaz and Bullcoming but before Williams. Nonetheless, the autopsy report in Freeman qualified as testimonial under the test adopted by the plurality in Williams because, "[b]y the time the victim's autopsy was conducted, authorities had already concluded that she had been murdered and had begun to build their case against [Freeman] as the perpetrator." Id. at *13 (emphasis added). It also qualified as "testimonial" under the primary purpose test preferred by the dissenters in Williams because the intermediate appellate court in Freeman could not "say that the autopsy . . . had as its primary purpose anything other than use in a criminal trial." Id.

[34] After Crawford, and before Melendez–Diaz, courts had held that autopsy reports were not testimonial. See, e.g., United States v. De La Cruz, 514 F.3d 121, 133 (1st Cir. 2008) (holding that an autopsy report is a non-testimonial business record); United States v. Feliz, 467 F.3d 227, 236 (2nd Cir. 2006) (same).

(deciding that the autopsy report at issue "was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"); People v. Dungo, 286 P.3d 442, 450 (Cal. 2012) (finding that even though California's statutory scheme requires the reporting of suspicious autopsy findings to law enforcement, an autopsy serves several purposes and the "autopsy report itself was simply an official explanation of an unusual death, and such official records are ordinarily not testimonial"); People v. Leach, 980 N.E.2d 570, 592 (Ill. 2012) (holding that autopsy reports are not testimonial and explaining that an autopsy report is prepared in the normal course of operation of the medical examiner's office, to determine the cause and manner of death, and is not prepared for the primary purpose of accusing "a targeted individual of engaging in criminal conduct" or providing "evidence in a criminal trial" (citations and internal quotation marks omitted)); State v. Maxwell, 9 N.E.3d 930, 950 (Ohio 2014) ("Autopsy reports are not intended to serve as an out-of-court substitute for trial testimony. Instead, they are created for the primary purpose of documenting cause of death for public records and public health." (citations and internal quotation marks omitted)).

Other courts have found that autopsy reports are testimonial statements which implicate Confrontation Clause protections. See, e.g., United States v. Ignasiak, 667 F.3d 1217, 1231 (11th Cir. 2012) (holding that, applying the logic of Crawford, Melendez–Diaz, and Bullcoming, the autopsy reports at issue were testimonial); Cuesta–Rodriguez v. State, 241 P.3d 214, 228 (Okla. Crim. App. 2010) (holding that, in light of Oklahoma's statutory scheme relative to the medical examiner's duty in the case of a suspicious death, an autopsy report in such cases would be testimonial); State v. Kennedy, 735 S.E.2d 905, 917-18 (W. Va. 2012) (holding, based partially on West Virginia's statutory scheme, that autopsy reports are under all circumstances testimonial).

Moreover, some courts have ruled since Melendez-Diaz and Bullcoming that the Confrontation Clause does not preclude experts from offering their own opinions, regardless of the independent admissibility of the material they relied upon in forming those opinions. See Nardi, 662 F.3d at 112 (citing cases). The Court of Criminal Appeals has so held. Freeman, 2012 WL 1656975, at *14 (recognizing that the testifying doctor placed some of his nontestifying colleague's findings before the jury while relating his own opinion about the cause of the victim's death but holding that such testimony "was well within" the doctor's field of expertise and that the autopsy report prepared by his colleague was "of a type reasonably relied upon by experts" in his field (internal quotation marks omitted)).

We need not decide in this case whether autopsy reports are testimonial or whether a medical examiner may testify about an autopsy report produced by another pathologist who does not testify at trial. Instead we hold only that no clear rule of law was breached in this

case by the admission of the autopsy reports or Dr. Funte's testimony about them.[35] Given the uncertainty that has existed in Confrontation Clause jurisprudence since Crawford, and in particular the lack of clarity regarding expert reports and testimony, which was actually exacerbated by the splintered decision in Williams, we conclude that the defendant has failed to establish that a clear and unequivocal rule of law was breached.

Furthermore, we also conclude, as did the Court of Criminal Appeals, that granting relief by way of the plain error doctrine is not "'necessary to do substantial justice.'" Smith, 24 S.W.3d at 283 (quoting Adkisson, 899 S.W.2d at 641-42). Dr. Funte testified as an expert without any objection from the defendant. The defendant did not contest the causes of the victims' deaths or any other conclusions or information contained in the autopsy reports or in Dr. Funte's testimony. Nor did the autopsy reports or Dr. Funte's testimony implicate the defendant or tie him to these homicides. Under these circumstances, granting relief is not necessary to do substantial justice. See Freeman, 2012 WL 1656975, at *13 (concluding that granting relief was not necessary to do substantial justice even though the autopsy report was testimonial and should not have been admitted because the defendant "did not contend that the victim's death was anything other than a homicide," and challenged only his identity as the perpetrator of the victim's murder, an issue upon which neither the autopsy report nor the pathologist's testimony "shed much light"); State v. Flack, 753 S.E.2d 761, 769 (W. Va. 2013) (concluding that the admission of the state medical examiner's testimony about an autopsy report prepared by another pathologist was not plain error because the state medical examiner's testimony merely confirmed that the victim's death was a homicide caused by a gunshot wound and did not implicate the defendant or link the defendant to the homicide); State v. Blevins, 744 S.E.2d 245, 268 (W. Va. 2013) (per curiam) (concluding that the erroneous admission of the medical examiner's testimony regarding an autopsy report prepared by another pathologist was harmless beyond a reasonable doubt).

Thus, both because no clear rule of law was breached and because granting relief is not necessary to do substantial justice, the defendant is not entitled to relief under the plain error doctrine.

---

[35] We note, however, that unlike the autopsy report at issue in Freeman, the autopsy reports in this case were prepared on March 4, 2008, *before* the defendant was identified as a suspect. Thus, the autopsy reports here do not satisfy the Williams's plurality's test for determining whether a statement is testimonial. Furthermore, the primary purpose of these autopsy reports was to identify the victims, locate and document their injuries, and determine the causes of their deaths. Thus, it is not at all clear that these autopsy reports would be classified as testimonial under the test espoused by the dissenters in Williams. Nor is it clear that these autopsy reports would satisfy Justice Thomas's formality criterion.

### *3. Admission of Police Testimony Regarding C.J.'s Statements*

The defendant also argues that the trial court violated his constitutional right to confront the witnesses against him by allowing Sergeant Mullins, Lieutenant Davidson, and Sergeant Max to testify regarding C.J.'s statement identifying the defendant as the perpetrator. The State responds that the defendant failed to preserve the constitutional issue he now raises, pointing out that the defendant did not object at all to Sergeant Mullins and Lieutenant Davidson testifying about C.J.'s statement and objected to Sergeant Max's testimony only on the basis of hearsay. The defendant also failed to raise this constitutional issue in his motion for new trial, but he relied upon it in the Court of Criminal Appeals.

In this Court, the defendant also argues that the challenged testimony was inadmissible hearsay admitted in violation of the Tennessee Rules of Evidence. The defendant concedes that he did not raise this issue in his motion for new trial or in the Court of Criminal Appeals, but he argues that admission of this evidence amounted to plain error. We conclude that the defendant is not entitled to relief because he has failed to establish that admission of the challenged testimony breached a clear and unequivocal rule of law.

First, even assuming the statements were hearsay,[36] the Tennessee Rules of Evidence recognize an exception for hearsay "statement[s] of identification of a person made after perceiving the person if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement." Tenn. R. Evid. 803(1.1). In this case, C.J.'s out-of-court identification satisfied the Rule 803(1.1) criteria for admission. C.J. testified at trial and was subject to cross-examination concerning the statement. Indeed, defense counsel thoroughly cross-examined C.J. at trial.

Second, as for any Confrontation Clause violation, there is no constraint on the use of prior testimonial statements when a declarant appears at trial and is subject to cross-examination. Crawford, 541 U.S. at 59 n.9 ("[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements." (citing California v. Green, 399 U.S. 149, 162 (1970)). The same is true of the right to confrontation protected by article I, section 9 of the Tennessee Constitution. Banks, 271 S.W.3d at 118-19.

The defendant's reliance upon California v. Green, 399 U.S. 149 (1970) for a contrary rule is misplaced. In Green, the Supreme Court overruled California decisions and held that "where the declarant is not absent, but is present to testify and to submit to

---

[36] "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c).

cross-examination, our cases, if anything, support the conclusion that the admission of [the] out-of-court statements does not create a confrontation problem." Id. at 162. Thus, under both Green and Crawford, when a declarant appears for cross-examination at trial, "the Confrontation Clause places no constraints at all on the use of [the declarant's] prior testimonial statements." Crawford, 541 U.S. at 59 n.9; see also People v. Argomaniz–Ramirez, 102 P.3d 1015, 1018 . ( "Because the hearsay declarants will testify at trial and will be subject to cross-examination, admission of their out-of-court statements does not violate the Confrontation Clause"); Clark v. State, 808 N.E.2d 1183, 1189 n.2 (Ind. 2004) (stating that the Supreme Court expressly noted in Green that, "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support the conclusion that the admission of his out-of-court statements does not create a confrontation problem"); State v. Gorman, 854 A.2d 1164, 1178 (Me. 2004) (stating that, according to Crawford, the Confrontation Clause was satisfied when the defendant "was given the opportunity to examine and cross-examine his mother before the jury regarding what she did and did not recall and the reasons for her failure of recollection"); Cooley v. State, 849 A.2d 1026, 1031 (Md. Ct. Spec. App. 2004) (holding that "Crawford did not overrule the unbroken line of cases holding that the Confrontation Clause does not operate to exclude pretrial statements made by a witness who actually testifies at trial"); State v. Tate, 682 N.W.2d 169, 176 n. 1 (Minn. Ct. App. 2004) (stating that because the declarant testified at trial and was subject to cross-examination, the Confrontation Clause did not apply to invalidate the hearsay exception); State v. Carothers, 692 N.W.2d 544, 547-49 (S.D. 2005); Crawford v. State, 139 S.W.3d 462, 464 (Tex. App. 2004) (stating that "[a] careful reading of the Crawford opinion reveals that its holding applies only when the extrajudicial testimonial statements of a witness *who does not testify at trial* are sought to be admitted" (italics in original)).

In this case, C.J. testified at trial and was cross-examined thoroughly about his prior statements of identification and his identification of the defendant at trial. Defense counsel ably questioned him about his statements identifying or implicating others as the perpetrators and about his ability to perceive what was happening at the time of the events. We agree with the Court of Criminal Appeals that there is simply no merit to the defendant's arguments that admission of these statements was error, much less plain error. Dotson, 2013 WL 4728679, at *49.

### D. Admission of Evidence Regarding the Defendant's Imprisonment

Prior to trial, the defendant filed a motion in limine seeking to prevent the prosecution from introducing evidence of his prior incarceration for second degree murder. Applying the guidelines provided in Tennessee Rule of Evidence 404(a) and (b), the trial court denied the motion. The trial court found that the defendant's prior incarceration had been proven by

clear and convincing evidence. The trial court emphasized that the prosecution had no intention of informing the jury of the crime for which the defendant was incarcerated. The trial court further found that statements about the defendant's and Cecil's relationship, which mentioned the defendant's prior incarceration, as well as statements the defendant made to the police and family members after the murders regarding his unwillingness to return to prison, were "highly probative as to the defendant's intent, motive and state of mind at the time of the commission of the offense[s] and outweighed any prejudicial effect to the defendant." Dotson, 2013 WL 4728679, at *59. However, the trial court refused to allow the prosecution unlimited use of evidence regarding the defendant's prior incarceration, stating that "the mere fact that a witness'[s] knowledge of the defendant was in part or fully conditioned upon defendant's incarceration" was "simply insufficient to warrant the witness divulging this fact to the jury." Id.

The defendant contends that the prosecution violated the trial court's ruling on the motion in limine by eliciting testimony from Deputy Director Armstrong that he knew of the defendant's prior incarceration when he went into the room to question the defendant. In the pertinent exchange, Deputy Director Armstrong stated, "Before going in that interview room, I knew that [the defendant] was very familiar with the criminal justice system because he had recently been released from prison." Defense counsel objected, relying on the trial court's ruling on the motion in limine. The trial court overruled the objection, stated that the testimony was not inappropriate, and pointed out that numerous witnesses had already testified to the defendant's prior incarceration.

The State then asked Deputy Director Armstrong why having background information before conducting an interview was important. Deputy Director Armstrong responded:

> You try to get as much information about a person as you can. Before you interview them, you want to know how many times they've been arrested. You want to know if they're familiar with the criminal justice system. You want to know if it's the first time they've ever been arrested and you want to know have they ever been arrested of anything, a violent crime . . . . So it helps in an interview to know as much as you can about a person before you proceed with it.

The trial court then instructed the jury as follows:

> Before we go any further, ladies and gentlemen, there has been testimony in this case about whether or not [the defendant] had been in jail. There's been some testimony with regard to the fact that he's been in jail. I want you to understand the fact that he has been in jail has no bearing

-80-

whatsoever on your decision in this case. You're to decide this case based upon the facts that are presented in this case. The only reason that issue has even come before you is it plays into certain parts of the proof. That's the only thing you're to consider that for. Does everybody understand that? Thank you.

On appeal to the Court of Criminal Appeals, the defendant challenged Deputy Director Armstrong's testimony and argued that the trial court erred by overruling the defense objection and finding it admissible. The Court of Criminal Appeals concluded that Deputy Director Armstrong's testimony regarding the defendant's past incarceration was not related to one of the categories of information the trial court described as permissible in the order denying the defense motion in limine. Dotson, 2013 WL 4728679, at *61. The intermediate appellate court also concluded that, because Deputy Director Armstrong had failed to explain why knowing about an interview subject's prior criminal history was important, it could not conclude that his testimony was relevant to "the integrity of the defendant's confession—that the defendant knew his rights, had experience with police, and would not be easily coerced into confessing to a heinous crime he did not commit," as the State argued. Id. (internal quotation marks omitted). Nonetheless, the intermediate appellate court concluded that any error was harmless because: (1) by the time "Deputy Director Armstrong testified, multiple other witnesses had testified to the defendant's prior incarceration within the bounds set forth by the trial court in its pretrial order"; (2) "Deputy Director Armstrong did not state the length or reason for the defendant's incarceration"; and (3) "[t]he trial court also gave a limiting instruction, which the jury is presumed to have followed." Id.

In this Court, the defendant argues that the Court of Criminal Appeals erred in concluding that admission of the testimony was harmless error. He says that Deputy Director Armstrong's testimony implied that the defendant had been recently released from prison for committing a violent crime and placed "virtual shackles" on the defendant. The defendant says that the trial court compounded, rather than cured, the error by first instructing the jury to disregard the defendant's history of incarceration and by then stating that the prior incarceration was relevant to certain parts of the proof.

The State responds that the trial court did not abuse its discretion in overruling the defense objection to Deputy Director Armstrong's testimony because the testimony was not offered to show the defendant's propensity for criminal activity but to show his familiarity with the criminal justice system, and thus aid the jury in assessing the integrity of the defendant's confession. Even if the Court agrees with the Court of Criminal Appeals' conclusion that the objection should have been sustained, the State argues that the error was harmless.

Tennessee Rule of Evidence 404(b) provides, in relevant part, as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

We have cautioned that trial courts should take a "restrictive approach" when admitting Rule 404(b) evidence because it "'carries a significant potential for unfairly influencing a jury.'" State v. Dotson, 254 S.W.3d 378, 387 (Tenn. 2008) (quoting State v. Bordis, 905 S.W.2d 214, 227 (Tenn. Crim. App. 1995) (internal quotation marks omitted)). "[S]uch evidence easily results in a jury improperly convicting a defendant for his or her bad character or apparent propensity or disposition to commit a crime regardless of the strength of the evidence concerning the offense on trial." Id. at 387 n.7 (quoting State v. Rickman, 876 S.W.2d 824, 828 (Tenn. 1994)); State v. Mallard, 40 S.W.3d 473, 488 (Tenn. 2001). "'[T]he risk that a jury will convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment—creates a prejudicial effect that outweighs ordinary relevance.'" State v. Sexton, 368 S.W.3d 371, 403 (Tenn. 2012) (quoting Old Chief v. United States, 519 U.S. 172, 181 (1997)).

However, as we have previously observed in another context:

> the Rule 404(b) criteria—in particular, the existence of a material issue at trial and the balancing of the probative value and unfair prejudice—require consideration of the evidence presented at trial. Thus, trial courts must be cognizant that if pretrial evidentiary rulings are made, they may need to be reconsidered or revised based on the evidence presented at trial.

State v. Gilley, 173 S.W.3d 1, 6 (Tenn. 2005). Finally, we have explained that if a trial court substantially complies with the procedures set out in Rule 404(b) for evaluating the admissibility of evidence, the court's decision will be given great deference on appeal and will be reversed only if the trial court abused its discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Here the trial court substantially complied with the procedure set out in Rule 404(b), both at the pretrial hearing on the motion in limine and when considering the defense objection to Deputy Director Armstrong's testimony. Unlike the Court of Criminal Appeals, we are unable to conclude that the trial court abused its discretion by overruling the defense objection to Deputy Director Armstrong's testimony. The testimony was offered for a purpose other than showing action in conformity with character. Specifically, the testimony was intended to inform the jury, as the State asserts, of the defendant's familiarity with the criminal justice system so that the jury could better evaluate the integrity of the defendant's confession. Deputy Director Armstrong did not mention the crime, or discuss how long the defendant had been incarcerated, or disclose when the defendant was released from incarceration. As we pointed out in Gilley, a trial court must reconsider pretrial rulings in light of the proof offered at trial, and that is precisely what the trial court in this case did. In overruling the objection, the trial court pointed out that numerous witnesses—seven according to a statement by defense counsel—had already testified about the defendant's prior incarceration. The record simply does not indicate that the trial court abused its discretion in overruling the motion.

We do agree with the Court of Criminal Appeals, however, that, even assuming the testimony was admitted in error, the error was harmless. See State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993). Deputy Director Armstrong neither informed the jury of the crime for which the defendant had been incarcerated nor implied that the jury should consider the defendant's prior incarceration as evidence of guilt. The trial court gave a limiting instruction, which cautioned the jury not to consider the defendant's prior incarceration as evidence of guilt, and the testimony was at most cumulative to evidence already properly admitted from multiple prior witnesses. The defendant is not entitled to relief on this issue.

### E.  Mandatory Review

As to each of the defendant's six death sentences, this Court is required to determine: (1) whether the sentence "was imposed in any arbitrary fashion"; (2) whether the evidence supports the jury's findings that the prosecution proved aggravating circumstances beyond a reasonable doubt; (3) whether the evidence supports the jury's determination that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt; and (4) whether the sentence of death "is excessive or disproportionate to the penalty

imposed in similar cases, considering both the nature of the crime and the defendant." Tenn. Code Ann. § 39-13-206(c)(1).

### *1. Arbitrary Imposition of the Death Sentence*

The defendant submits that Tennessee's death penalty scheme includes a "fatally flawed proportionality review" which "inherently results in an arbitrary imposition of the death penalty," because only those cases in which a capital sentencing hearing was held are included in the universe for comparison. He also says that Tennessee's proportionality system is flawed because it fails to compare death sentences imposed in this State to those imposed in other jurisdictions. He asks this Court to adopt the position espoused by the separate opinion in State v. Chalmers, 28 S.W.3d 913, 921-925 (Tenn. 2000) (Birch, J., concurring and dissenting).

This Court has repeatedly rejected these arguments. Recently, a majority of this Court exhaustively re-examined the propriety of including in the pool for comparison only those similar cases in which a capital sentencing hearing has been conducted, and we held that this limitation is appropriate and does not render Tennessee's capital sentencing scheme arbitrary. State v. Pruitt, 415 S.W.3d 180, 217 (Tenn. 2013); see also State v. Godsey, 60 S.W.3d 759, 783-86 (Tenn. 2001); State v. Bland, 958 S.W.2d 651, 666-67 (Tenn. 1997). We expressly re-affirmed the analysis adopted in Bland. Pruitt, 415 S.W.3d at 215-17. As for the defendant's argument that capital cases from other jurisdictions should be included in the pool for comparison, it is sufficient to quote from a prior decision of this Court explaining why this argument lacks merit:

> In Tennessee, comparative proportionality review is a duty imposed upon this Court and the Court of Criminal Appeals by a statute that is part of the Tennessee capital sentencing scheme. Nothing in the statute indicates that the General Assembly intended the term "similar cases" to include out-of-state cases. In addition, given that capital sentencing statutes differ from state to state, cases from other jurisdictions are likely not "similar" for purposes of comparative proportionality review.

Godsey, 60 S.W.3d at 786. For these reasons, we reject the defendant's assertion that his sentence, and Tennessee's system of proportionality review, is arbitrary.

Our review of the record also otherwise confirms that the defendant received a full and fair trial, which was conducted in accordance with the applicable statutes and procedural rules. Thus, we conclude that the defendant's sentence was not imposed in an arbitrary fashion.

## 2. Evidence of Aggravating Circumstances

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, the relevant inquiry is whether a rational trier of fact, taking the evidence in the light most favorable to the prosecution, could have found the existence of the aggravating circumstances beyond a reasonable doubt. State v. Jordan, 325 S.W.3d 1, 66-67 (Tenn. 2010); State v. Rollins, 188 S.W.3d 553, 571 (Tenn. 2006).

### a. Cecil Dotson, Sr.

The jury applied three aggravating circumstances when imposing the death sentence for the defendant's conviction of first degree murder of Cecil, and the evidence is abundantly sufficient to support the jury's findings. First, during the penalty phase of the trial, the parties stipulated that the defendant had previously been convicted of second degree murder and that this felony conviction was a crime of violence. This stipulation thus established that the defendant had been "previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person." Tenn. Code Ann. § 39-13-204(i)(2).

Second, the jury found that the defendant knowingly created a great risk of death to two or more persons in the course of murdering Cecil. See Tenn. Code Ann. § 39-13-204(i)(3). This aggravating circumstance "'contemplates either multiple murders or threats to several persons at or shortly prior to or shortly after an act of murder upon which the prosecution is based.'" Johnson v. State, 38 S.W.3d 52, 60 (Tenn. 2001) (quoting State v. Cone, 665 S.W.2d 87, 95 (Tenn. 1984)). "Most commonly, this aggravating circumstance 'has been applied where a defendant fires multiple gunshots in the course of a robbery or other incident at which persons other than the victim are present.'" Id. (quoting State v. Henderson, 24 S.W.3d 307, 314 (Tenn. 2000)). The (i)(3) aggravating circumstance has been applied where the proof showed a defendant "fired random shots with others present or nearby," or the defendant engaged in a shootout with others, "or the defendant actually shot people in addition to the murder victim." Id. at 60-61 (footnotes omitted). The proof in this case showed that three others were present in the living room where Cecil was shot multiple times. The evidence is sufficient to support the jury's finding of the (i)(3) aggravating circumstance.

The third aggravating circumstance the jury relied upon is "'mass murder,' which is defined as the murder of three (3) or more persons, whether committed during a single criminal episode or at different times within a forty-eight-month period." Tenn. Code Ann. § 39-13-204(i)(12). This Court has interpreted the mass murder aggravating circumstance as requiring proof that the defendant has been *convicted* of three or more murders in

Tennessee within a period of forty-eight (48) months prior to the sentencing hearing at which the murders are used to establish the aggravating circumstance. State v. Reid, 213 S.W.3d 792, 819 (Tenn. 2006); State v. Black, 815 S.W.2d 166, 183-184 (Tenn. 1991); State v. Bobo, 727 S.W.2d 945, 955 (Tenn. 1987). In the instant case, the defendant had been convicted prior to his capital sentencing hearing of murdering six persons in the same criminal episode. This proof is overwhelmingly sufficient to support application of the mass murder aggravating circumstance.

### b. Ms. Williams, Mr. Seals, and Ms. Roberson

In sentencing the defendant to death for his convictions of first degree murders for killing Ms. Williams, Mr. Seals, and Ms. Roberson, the jury applied the three aggravating circumstances already discussed, as well as the following two additional aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing the lawful arrest or prosecution of the defendant or another; and (2) the murder was knowingly committed while the defendant had a substantial role in committing, or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit any first degree murder. See Tenn. Code Ann. § 39-13-204(i)(6), (7).

We have already determined that the evidence is sufficient to support the jury's findings: (1) that the defendant had been "previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person[];" Tenn. Code Ann. § 39-13-204(i)(2); (2) that the defendant "knowingly created a great risk of death to two (2) or more persons, other than the victim murdered[];" see Tenn. Code Ann. § 39-13-204(i)(3); and (3) that the defendant committed mass murder, see Tenn. Code Ann. § 39-13-204(i)(12). We next consider whether the proof is sufficient to support the jury's findings of the two additional aggravating circumstances.

The (i)(6) aggravating circumstance requires proof that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-201(i)(6). This aggravating circumstance "may be applied when the proof shows that avoiding arrest was one motivation for the killing." State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001). Its application is "not limited to only those killings which are solely or predominantly motivated by a desire to avoid arrest or prosecution." Id.; see also State v. Bush, 942 S.W.2d 489, 504–05 (Tenn. 1997). The evidence in this case showed that the defendant desperately wanted to avoid returning to jail. He admitted shooting Cecil during an argument. Ms. Williams, Mr. Seals, and Ms. Roberson, who were present at the home and in the vicinity of the living room—although Mr. Seals may have been in the kitchen—would have been able to identify the defendant as the perpetrator of Cecil's murder. By his own admission, the defendant left

the home believing that all inside were dead, although he denied perpetrating the murders at trial. The defendant told his mother that he killed the children because they could identify him. All of this proof is sufficient to support the jury's finding that the murders of Ms. Williams, Mr. Seals, and Ms. Roberson were motivated by and committed, at least in part, to avoid arrest and prosecution. Tenn. Code Ann. § 39-13-204(i)(6).

The proof also supports the jury's finding that the defendant knowingly committed the murders of Ms. Williams, Mr. Seals, and Ms. Roberson while he had a substantial role in committing or attempting to commit first degree murder. See Tenn. Code Ann. § 39-13-204(i)(7). Indeed, the defendant murdered Ms. Williams, Mr. Seals, and Ms. Roberson, during the course of murdering Cecil.

### c. Cemario and Cecil II

In sentencing the defendant to death for the premeditated first degree murders of Cemario and Cecil II, the jury applied the same five aggravating circumstances that it had applied with regard to the first degree murders of Ms. Williams, Mr. Seals, and Ms. Roberson, as well as two additional aggravating circumstances: (1) the victim was less than twelve years old and the defendant was eighteen years old or older; and (2) the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death. See Tenn. Code Ann. § 39-13-204(i)(1), (5).

We have already concluded that the evidence is sufficient to support five of the seven aggravating circumstances that the jury applied to impose the death sentences for the defendant's first degree murder convictions of Cemario and Cecil II. We also conclude that the proof is sufficient to support the jury's findings of the two additional aggravating circumstances that were applied only to the murders of Cemario and Cecil II.

First, the record overwhelmingly supports the jury's findings that Cemario and Cecil II were less than twelve years old and the defendant was eighteen years old or older. See Tenn. Code Ann. § 39-13-204(i)(1). The evidence established that Cemario and Cecil II were four years old and two years old, respectively, when they were killed and that the defendant was over the age of eighteen.

The proof also supports the jury's findings that Cemario's and Cecil II's murders were "especially heinous, atrocious, or cruel, in that [they] involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). The medical examiner testified to the multiple extensive injuries that were inflicted upon each of these victims and explained that the children sustained more than one injury that was capable of causing their deaths. The proof established that each victim was stabbed repeatedly and

-87-

severely beaten and that the physical abuse was beyond that necessary to cause death. The proof is more than sufficient to support the jury's finding of this aggravating circumstance.

### 3. *Weighing Aggravating and Mitigating Circumstances*

The evidence also supports the jury's finding that the aggravating circumstances applicable to each first degree murder conviction outweighed any mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206 (c)(1)(C). The trial court instructed the jury as to the following mitigating circumstances: (1) any lingering or residual doubt regarding the defendant's guilt; (2) the defendant was raised in a dysfunctional family since birth; (3) the defendant suffered childhood neglect; (4) the defendant's parents separated when he was six years old, and his father was not part of his life; (5) the defendant changed residences and schools on multiple occasions throughout early childhood; (6) the defendant was retained in the fourth grade twice due to truancy and was absent from school many times as a child; (7) the defendant was diagnosed with a learning disability; (8) the defendant's mother did not attend scheduled meetings and did not appear at juvenile court hearings on multiple occasions; (9) at the age of eighteen, the defendant witnessed what he believed to be intentional physical abuse of his younger brother by his mother; and (10) any other mitigating factor raised by the evidence produced by either the prosecution or defense in the guilt or sentencing hearing. The State presented evidence aimed at countering the mitigating circumstances on which the defendant relied.

Having thoroughly reviewed the record, we conclude that a rational juror could have concluded that the aggravating circumstances established by the State beyond a reasonable doubt as to each of the murders outweighed any mitigating circumstances and justified imposition of the death penalty for the first degree murders of Cecil, Ms. Williams, Mr. Seals, Ms. Roberson, Cemario, and Cecil II.

### 4. *Proportionality Review*

We next consider whether the sentences imposed in this case are excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D). A death sentence is disproportionate only if "the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665. A death sentence is not disproportionate merely because the circumstances of the offense are similar to those of another offense for which the defendant received a life sentence. Id. An appellate court does not function as a "super jury," Godsey, 60 S.W.3d at 782, nor does an appellate court assure "that a sentence less than death was never imposed in a case with similar characteristics," Bland, 958 S.W.2d at 665. Instead, our

role in comparative proportionality review is to "assure that no aberrant death sentence is affirmed." Id.

We have no mathematical or scientific formula for fulfilling this role. Id. at 668. Rather, this Court uses "the precedent-seeking method of comparative proportionality review in which we compare the case before us with other cases involving similar defendants and similar crimes." State v. Davis, 141 S.W.3d 600, 619-20 (Tenn. 2004). This method requires an examination and comparison of "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved" in the case under review, with other similar cases. State v. Stevens, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison, we consider the following factors, which focus on the nature of the crime: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victim's circumstances, including age, physical and mental conditions, and the victim's treatment during the killing; (6) the absence or presence of provocation; (7) the absence or presence of justification; and (8) the injury to and effects on non-decedent victims. Bland, 958 S.W.2d at 667.

When reviewing the characteristics of the defendant, we consider: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of the helplessness of the victim(s); and (8) the defendant's capacity for rehabilitation. Id. Moreover in conducting this review, "'we select from the pool of cases in which a capital sentencing hearing was actually conducted to determine whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death.'" State v. Holton, 126 S.W.3d 845, 866 (Tenn. 2004) (quoting State v. Carruthers, 35 S.W.3d 516, 570 (Tenn. 2000)).

The sentences of death in the present case are neither excessive nor disproportionate to the penalty imposed in similar cases. The proof shows that on March 2, 2008, the defendant shot and killed his brother, Cecil, Ms. Williams, Mr. Seals, and Ms. Roberson. The defendant then stabbed and beat with wooden boards his four nephews and his niece, who ranged in age from nine years to two months old. Four-year-old Cemario and two-year-old Cecil II did not survive the brutal attacks, and the other children's survival was extraordinary, considering that the defendant left them in the home unattended and seriously injured for nearly forty hours. Cecil, Ms. Williams, Mr. Seals, and Ms. Roberson sustained multiple gunshot wounds. The children, Cemario and Cecil II, suffered multiple, indeed, innumerable blunt force and sharp force injuries. The unprovoked attacks on the children

were both cruel and brutal. The defendant never attempted to render aid or summon help, but instead he left the scene, spent the remainder of the night and the next day with his girlfriend, and went to a restaurant for dinner later that day with his brother and a friend. He also reported for work on the Monday following the weekend killings and crime spree. The defendant admitted to the crimes only after he was confronted with a tape recording of one of his surviving nephews identifying him as the perpetrator. Although he then confessed to committing the crimes to the police and told his mother that he had murdered the children because they saw him shoot the adults, at trial he denied any involvement in the crimes and claimed that he had hidden beneath a bed while other unknown persons murdered and assaulted the victims.

In mitigation, the defendant offered proof that his family life was less than ideal. His parents married at a very young age, argued often, and engaged in physical altercations. As a child and youth, the defendant witnessed his father physically abuse his mother and his mother tear out windows in an apartment complex and place her baby in a bathtub of what the defendant perceived to be scalding water. When the defendant was six years old, his mother left his father, taking the defendant and his siblings with her and not contacting the defendant's father for four or five months. The defendant's family lived in poverty, and his mother was often away from home, leaving the defendant's sister, Nicole, to care for the defendant and Cecil. The children often had little food to eat, and the defendant and Cecil sometimes went hungry and other times stole money from their grandmother to buy food. Eventually, when the stealing persisted, their grandmother would no longer allow them to visit her home.

As for educational ability, the defendant was diagnosed with a learning disability in reading and math, was enrolled in resource classes, failed the fourth grade twice due to excessive absences, was socially promoted, was teased by other children for not having proper school clothing, and left school at age sixteen, while still only in the eighth grade, having attended ten different schools and having been suspended so often that the school system refused to allow him to continue to attend.

The defendant had disciplinary problems both at school and at home and was provided with individual counseling. His mother either failed to show up for or cancelled appointments with counselors. By age fifteen, the defendant had become involved in the juvenile court system and had several arrests and juvenile adjudications, and one of these incidents involved the use of weapons. The defendant was often involved in fights, and school and juvenile records referenced the defendant's fights, his hostility toward his brother, Cecil, and his mother's fear of him. The defendant's mother attended juvenile court with him on many occasions, and when she was unable to attend, his sister Nicole attended on her behalf.

The only legitimate job that the defendant ever held was as a security guard at the age of eighteen. At the age of nineteen, he pled guilty to second degree murder and was sentenced to eighteen years in prison. He joined the Crips gang while in prison and was written up for refusing to participate, for cursing an officer, and for cutting an inmate who was trying to leave the Crips. The defendant served fourteen years of his eighteen-year sentence before being released on parole. The defendant's mother and her husband visited him only once during his fourteen years in prison. No other family members visited him, although the defendant spoke with his father by telephone a few times.

Considering the record in this case in light of the relevant factors, we conclude that the defendant's death sentences are not excessive or disproportionate to the penalty imposed in similar cases. While no two capital cases and no two defendants are alike, the following cases and defendants share several similarities with this case and this defendant. State v. Jordan, 325 S.W.3d 1 (Tenn. 2010) (upholding the death sentence where the defendant shot and killed his estranged wife and two men at his wife's work place and the jury found five aggravating circumstances); State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (upholding the death sentence where the defendant shot and killed his four children and the jury found the mass murder aggravating circumstance and, as to three victims, the under-age-twelve aggravating circumstance); State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000) (upholding the death penalty where the defendant shot two men, strangled the mother of one of the men, and buried all three victims alive and the jury found four aggravating circumstances, including prior violent felony, heinous, atrocious, or cruel, felony murder, and mass murder); State v. Smith, 868 S.W.2d 561 (Tenn. 1993) (upholding the death penalty where the defendant shot and stabbed his wife and two stepsons and the jury found four aggravating circumstances, including heinous, atrocious, or cruel, murder to avoid apprehension, felony murder, and mass murder); State v. Payne, 791 S.W.2d 10 (Tenn. 1990) (upholding the death sentence where the defendant stabbed his girlfriend's neighbor and the neighbor's two-year-old daughter and the jury found three of the same aggravating circumstances as those applied in this case).

This case is not identical to these earlier capital cases primarily because the murders and assaults the defendant perpetrated are some of the most horrendous ever committed in Tennessee. However, taken as a whole, this case is by no means "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665. Thus, we conclude that the sentences of death are not excessive or disproportionate to the penalties imposed in similar cases.

### III. Conclusion

We have considered the entire record in this case and find that the sentences of death were not imposed in any arbitrary fashion, that the sentences of death are not excessive or disproportionate, that as to each death sentence the evidence supports the jury's findings of the statutory aggravating circumstances and the jury's finding that these aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. We have also considered all of the defendant's assignments of error and conclude that none has merit. As to the issues raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentences of death shall be carried out as provided by law on the 17th day of November, 2015, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE